In the Matter of the Application of A AND M, Respondents, for an Order Quashing Subpoenas.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JOHN DOE, Respondent.

Fourth Department, March 1, 1978

## APPEARANCES OF COUNSEL

*Edward C. Cosgrove, District Attorney (Judith B. Manzella* and *Nancy A. Piggush* of counsel), for appellant.

*Runfola, Birzon & Renda (Paul I. Birzon* of counsel), for respondents.

## OPINION OF THE COURT

DENMAN, J.

We are confronted with an issue involving significant competing interests: whether the State, in the exercise of its duty to seek criminal evidence, may compel the parents of a minor child to testify before a Grand Jury concerning admissions by the child which were made in confidence. This issue is, we believe, one of first impression in this State.

The District Attorney of Erie County is conducting an investigation into an alleged arson which occurred at the Student Center of Canisius College in the City of Buffalo. Several witnesses appeared before the Grand Jury and testimony was elicited placing "John Doe", a 16-year-old boy, near the scene of the fire. The District Attorney issued subpoenas to "A" and "M", the youth's parents, allegedly seeking evidence in the form of admissions thought to have been made by the boy to his parents. The parents were not at the scene of the fire and thus have no personal knowledge of the incident.

A motion brought by respondents to quash the subpoenas was granted. The People assert that Trial Term erroneously quashed the subpoenas first, by extending the marital privilege so as to encompass a parent-child privilege and second, by finding that there is a constitutional right of privacy which protects confidential intrafamilial communications.

Our examination of respondents' claim of privilege is hindered by the absence of findings of fact with respect to the circumstances under which the alleged admissions were made. Respondents suggest by way of argument that the youth went to his parents seeking guidance and counsel and, in the privacy of their home, disclosed to them certain facts in the expectation that such information would be held in confidence.

■ Seeking a traditional basis for protecting the disclosures here, the court below suggested that they are encompassed within the marital privilege, CPLR 4502 (subd [b]), which generally precludes disclosure of a confidential communication made by one spouse to the other during marriage. That privilege, by its very terms, does not encompass statements by a third party in the presence of a married couple.

Because the marital privilege prevents access to relevant and frequently probative evidence, the exercise of the privilege is carefully restricted and subjected to close scrutiny.

Historically, to be given a cloak of confidentiality, communications between husband and wife were required to be either "expressly made confidential, or such as [were] of a confidential nature or induced by the marital relation." *(Parkhurst v Berdell,* 110 NY 386, 393.) No privilege attaches where it is found that there was a lack of confidentiality at the time disclosure was made. Hence disclosure is mandated when matters were discussed in the presence of third parties even, as they may have been in this case, in the presence of offspring old enough to comprehend what is being said. *(People v Melski,* 10 NY2d 78, 82, citing *Wolfle v United States,* 291 US 7, 17.) The communications at issue here involve revelations by a minor to his parents, not communications made by one spouse to the other as required by CPLR 4502 (subd [b]). Furthermore, the presence of the minor child destroys any aura of confidentiality for purposes of the marital privilege which might otherwise have attached to conversations directly between husband and wife at that time.

██ We conclude not only that the communication in issue does not fall within the marital privilege, but also that there is not, as respondents claim, an attorney-client privilege upon the facts alleged. (See CPLR 4503, subd [a].) The boy's father is an attorney; however, his professional status is coincidental under the circumstances given here. That the boy was speaking to his father qua father, not qua attorney, is borne out by the fact that he also confided in his mother, who is not an attorney. (See *Matter of Kinoy,* 326 F Supp 400.)

Although the communication is not protected by a statutory privilege, we do not conclude that it may not be shielded from disclosure. It would be difficult to think of a situation which more strikingly embodies the intimate and confidential relationship which exists among family members than that in which a troubled young person, perhaps beset with remorse and guilt, turns for counsel and guidance to his mother and father. There is nothing more natural, more consistent with our concept of the parental role, than that a child may rely on his parents for help and advice. Shall it be said to those parents, "Listen to your son at the risk of being compelled to testify about his confidences?"

██ It is urged that the court was in error in finding that the Constitution confers a right of family privacy. That position fails to consider a host of cases which have given constitutional dimension to matters concerning the relational inter-

ests of parents and children and which acknowledge a "private realm of family life which the state cannot enter." *(Prince v Massachusetts,* 321 US 158, 166; see, also, *Cleveland Bd. of Educ. v La Fleur,* 414 US 632; *Meyer v Nebraska,* 262 US 390; *Pierce v Society of Sisters,* 268 US 510; *Roe v Wade,* 410 US 113; *Wisconsin v Yoder,* 406 US 205; *Stanley v Illinois,* 405 US 645; *Ginsberg v New York,* 390 US 629; *Griswold v Connecticut,* 381 US 479; *Poe v Ullman,* 367 US 497.)

In *Pierce v Society of Sisters (supra)* and *Meyer v Nebraska (supra)* the Supreme Court struck down State laws which sought to regulate, in the latter case, what children could be taught and, in the former, by whom they could be taught. Those decisions, whose continued vitality is clear from their frequent reference, were based on the principle that "the parental right to guide one's child intellectually and religiously is a most substantial part of the liberty and freedom of the parent." *(Pierce v Society of Sisters, supra,* p 518.) Dealing with a child labor statute in *Prince v Massachusetts (supra,* p 166) the court declared that, "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."

Because the State has traditionally depended on the parent-child relationship to provide the care, nurture, education and moral training of children, the courts have been hesitant to interfere with the autonomy of the family unit.[1] "[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children *Wisconsin v. Yoder,* 406 U.S. 205, 231-233" *(Smith v Organization of Foster Families,* 431 US 816, 844). That is not to say that the State may never intrude its authority to regulate matters touching upon familial relationships, but only that when it attempts to do so, the governmental needs asserted must be carefully examined in order to insure that there exists a legitimate purpose in abridging this familial interest.

The Supreme Court has for many years recognized that,

---

1. For an excellent discussion of the historicial development of the legal principles supporting family integrity, see The Fundamental Right to Family Integrity and its Role in New York Foster Care Adjudication (44 Brooklyn L Rev 63).

although not specifically defined in the Constitution, there are rights "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *(Snyder v Massachusetts,* 291 US 97, 105.) Refining that principle in *Griswold v Connecticut* (381 US 479, *supra)* the Supreme Court declared that there is a constitutional right to privacy, specifically marital privacy, and that such right was to be found within the penumbra of other rights specifically enumerated. Although the several opinions in *Griswold* disclose a divergence of philosophy as to the source of this right,[2] the court articulated for the first time a fundamental right of privacy of constitutional dimension and signaled the willingness of the court to prevent encroachment by the State into certain enclaves of private life.[3]

This "right of privacy" had, of course, been a concern of thoughtful jurists prior to *Griswold.* Justice HARLAN, dissenting in *Poe v Ullman* (367 US 497) examined at length the problem of State intrusion upon the individual's right of privacy. He concluded (p 550) that "the Constitution protects the privacy of the home against all unreasonable intrusion," not only against the physicial intrusion prohibited by the Fourth Amendment, but also against that intrusion which would interfere with the integrity of family life, "something so fundamental that it has been found to draw to its protection the principles of more than one explicitly granted Constitutional right" (pp 551-552).

In *Roe v Wade* (410 US 113) the constitutional right of privacy was reaffirmed and extended to a woman's decision whether or not to terminate her pregnancy. Mr. Justice STEWART, in his concurring opinion (pp 167-169) traced the source of that right to the doctrine of substantive due process

---

2. The majority opinion (DOUGLAS, J.) relies on "zones of privacy" created by "emanations" from the specific guarantees contained in the Bill of Rights.

One concurring opinion (GOLDBERG, J.) seems to rely on the Ninth Amendment for the proposition that the framers of the Constitution recognized that there were certain fundamental rights reserved to the people which were not enumerated in the first eight amendments but were nevertheless guaranteed to the people.

Justices. HARLAN and WHITE, in separate concurring opinions, both indicate that focus on the Bill of Rights is too restrictive and that the privacy interest protected finds its source directly in the due process clause of the Fourteenth Amendment.

Justices BLACK and STEWART, in dissent, could find no constitutional right to marital privacy.

3. For a discussion of the significance of *Griswold,* see Emerson, Nine Justices in Search of a Doctrine (64 Mich L Rev 219).

under the Fourteenth Amendment, which the court had for some years evaded.

That approach was adopted by four Justices in *Moore v East Cleveland* (431 US 494). Setting forth the line of cases which has dealt with State intrusion into the "private realm of family life" and perceiving a "rational continuum which * * * includes a freedom from all substantial arbitrary impositions and purposeless restraints * * * and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their arbridgement" *(Poe v Ullman,* 367 US 497, 543 [HARLAN, J., dissenting]), the court in *Moore* found that the rationale of the preceding cases converged in one principle: "Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural." *(Moore v East Cleveland, supra,* pp 503-504. See, also, *Zablocki v Redhail,* — US —; 46 USLW 4093; *Smith v Organization of Foster Families,* 431 US 816, *supra;* The Supreme Court, 1976 Term, 91 Harvard L Rev 72, 128-137.)

Having established that the integrity of family relational interests is clearly entitled to constitutional protection, we turn to an examination of the nature of the interest asserted in the case before us. The role of the family, particularly that of the mother and father, in establishing a child's emotional stability, character and self-image is universally recognized. The erosion of this influence would have a profound effect on the individual child and on society as a whole. Child psychologists and behavioral scientists generally agree that it is essential to the parent-child relationship that the lines of communication remain open and that the child be encouraged to "talk out" his problems. It is therefore critical to a child's emotional development that he know that he may explore his problems in an atmosphere of trust and understanding without fear that his confidences will later be revealed to others.[4]

For a young person to develop into a responsible mature adult, capable of regulating his own life and attaining a sense

---

4. See, generally, Lidz, The Family: The Developmental Setting, American Handbook of Psychiatry, ed Arieti; Josselyn, Adolescence, *id;* Thomas, Parent Effectiveness Training, Plume Books.

of self-worth, it is necessary for him to perceive in his parents a sense of fairness and decency and those feelings which give him a sense of being loved and cared for. These values become especially important during turbulent times, such as ours, in which we experience rapid social change and fluctuating mores.[5]

If we accept the proposition that the fostering of a confidential parent-child relationship is necessary to the child's development of a positive system of values, and results in an ultimate good to society as a whole, there can be no doubt what the effect on that relationship would be if the State could compel parents to disclose information given to them in the context of that confidential setting. Surely the thought of the State forcing a mother and father to reveal their child's alleged misdeeds, as confessed to them in private, to provide the basis for criminal charges is shocking to our sense of decency, fairness and propriety. It is inconsistent with the way of life we cherish and guard so carefully and raises the specter of a regime which encourages betrayal of one's offspring. And if, as seems likely, the parents refuse to divulge their child's confidences, the alternatives faced by the parents, i.e., risk of prosecution for contempt or commission of perjury, could seriously undermine public trust in our system of justice.[6]

█ The course of constitutional law is filled with instances wherein the interests of the State in achieving a legitimate goal have been balanced against the rights of individual privacy guaranteed by the Constitution. (See, e.g., cases cited in *Roe v Wade,* 410 US 113, 152-154, *supra.)* The State has a legitimate interest in the process of fact-finding necessary to discover, try and punish criminal behavior. *(Branzburg v Hayes,* 408 US 665, 688.) Nevertheless, if it is determined that the information sought here was divulged by the boy in the context of the familial setting for the purpose of obtaining support, advice or guidance, we believe that the interest of society in protecting and nurturing the parent-child relation-

5. Conger, John Janeway, Adolescence and Youth: Psychological Development in a Changing World [2d ed], Harper & Rowe, NY; Nelson, Domestic Tranquility and the Right to Privacy: Is There a Right to Privacy Within the Family?, 18 S Tex LJ 121; Bloustein, Group Privacy: The Right to Huddle, 8 Rutgers Camden LJ 219.

6. In addition, the child, in witnessing his parents' refusal to testify or giving false testimony, will most certainly question the fairness of the legal process or learn that punishment can be avoided by compounding unlawful conduct. (Coburn, Child-Parent Communications: Spare the Privilege and Spoil the Child, 74 Dickenson L Rev 599, 628-629.)

ship is of such overwhelming significance that the State's interest in fact-findings must give way.[7]

Notwithstanding the absence of a statutory privilege, we may, nevertheless, draw from the principles of privileged communications in determining in what manner the protection of the Constitution should be extended to the child-parent communication.

██ ██ Four fundamental conditions must be established in order for a privilege to arise:

(1) the communications must originate in confidence that they will not be disclosed;

(2) this element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties;

(3) the relation must be one which, in the opinion of society, ought to be sedulously fostered; and

(4) the injury that would inure to the relation by the disclosure of the communication must be greater than the benefit thereby gained for the correct disposal of litigation. (8 Wigmore, Evidence [McNaughton rev], § 2285.)

It is probable that all of these criteria may be met under the circumstances alleged to exist in the case at bar. Nevertheless, although there are persuasive arguments to apply a privilege in these cirumstances,[8] we believe that the creation

---

7. The nature of the right asserted here by the parents would not suffer an "incidental burden" (Branzburg v Hayes, supra, p 682). Rather, the parents' relationship with their son would, in all likelihood, be destroyed by compelled disclosure.

8. See, e.g., Coburn, op. cit., discussing with approval an article by Manley, Patient, Penitent, Client, and Spouse in New York, 21 NYSBA Bull 288, 290, in which the author asserts that a privilege is justified if it satisfies certain "inveterate human instincts and desires" which are:

"1. Instinctive revulsion against the betrayal of a confidence.

"2. A sense of compassion even for a transgressor, i.e., a feeling that there should be for every man some sanctuary beyond the reach of society's law where he may safely confide his guilty secrets in an attempt to ease his troubled spirit.

"3. A sense of fair play related to the Norman view of a lawsuit as a species of contest or sporting event wherein it would be too easy, and hence unfair and against the 'rules of the game' to hound a man to his doom by convicting him through the lips of his own intimate friends, family, or medical, legal or spiritual advisers.

"4. A desire to preserve the function of certain socially valuable relationships even at the cost of occasional suppression of truth and injustice in such, reasonably few, particular cases.

"5. A feeling of individual and professional pride and self-importance in being the inviolable repository of others' secrets."

of a privilege devolves exclusively on the Legislature.[9] We conclude, however, the communications made by a minor child to his parents within the context of the family relationship may, under some circumstances, lie within the "private realm of family life which the state cannot enter." *(Prince v Massachusetts, 321 US 158, 166, supra.)*

▮ That is not to say, however, that parents in this setting are immune from Grand Jury process. When a witness is summoned to the Grand Jury by subpoena ad testificandum, he may seek to quash the subpoena in advance of his appearance pursuant to CPLR 2304, or he may assert a privilege at the time of questioning (CPL 190.30, subds 1, 5). Determination of the preferred method requires assessment of the interests sought to be protected and the State's interest in investigating criminal conduct. The Grand Jury is invested with broad investigatory powers (see, e.g., CPL 190.50, subds 2, 3) which would be severely restricted if witnesses could quash subpoenas without appearing before that body. This would have the undesirable effect of aborting the Grand Jury's power to inquire into areas of legitimate concern and permit the witness to dictate the course of the investigation and to limit the area into which the Grand Jury might probe. *(Blair v United States, 250 US 273, 282-283; Matter of Santangello v People, 38 NY2d 536; Matter of Manning v Valente, 272 App Div 358, affd 297 NY 681.)* Consequently, the courts have generally held that a witness subject to a subpoena ad testificandum cannot raise an issue of privilege until he has actually appeared and been questioned. A testimonial privilege "does not embrace a privilege against being required to claim the privilege". *(Matter of Cunningham v Nadjari, 39 NY2d 314, 318; Matter of Hirshfield v Craig, 239 NY 98.)*

There is no invasion of privacy in requiring the respondents to appear before the Grand Jury. "[W]ith the rarest of possible exceptions, nobody is immune from such appearances whether or not particular questions put by the Grand Jury to the witness who has appeared may give rise to valid claims of privilege." *(Matter of Kinoy, 326 F Supp 400, 401; see, also,*

---

9. An argument can certainly be made against creating a testimonial privilege, as such, with respect to the parent-child relationship. In Family Court proceedings, for example, the child could invoke such a privilege to prevent his parents from testifying about matters in which they were seeking the intervention and assistance of the court in controlling the child's behavior. Our discussion encompasses cases only in which all family members seek to preserve the confidentiality of the communications. (Cf. *Matter of Terry W., 59 Cal App 3d 745.)*

*Branzburg v Hayes,* 408 US 665, *supra; United States v Bryan,* 339 US 323; *Blair v United States, supra; Nixon v Sirica,* 487 F2d 700; *United States v Burr,* 25 Fed Cas No. 14,694.) Indeed, there may be questions which could properly be asked and answered which would not invade the area of family confidentiality.[10] The protection afforded that confidentiality is violated only by forcing the respondents to answer certain questions. It is unnecessary to fashion a remedy which sweeps more broadly than the area of protected communication and which would preclude the Grand Jury from inquiring into areas of proper concern. When respondents appear before the Grand Jury, they will be entitled to the advice of counsel *(People v Ianniello,* 21 NY2d 418) and may then assert their constitutional rights at the appropriate time, viz., when and if they are asked questions concerning communications made to them by their son in confidence. If the court is then asked to rule on such claim, it may find it necessary to hold an evidentiary hearing to determine whether the factual context in which the statements were made mandates that the information sought be given constitutional protection in accordance with this opinion.

The order should be reversed on the law, the motion denied and the matter remitted for further proceedings.

CARDAMONE, J. P., SIMONS, DILLON and WITMER, JJ., concur.

Order unanimously reversed on the law, motion denied, and matter remitted to Erie County Court for further proceedings in accordance with opinion by DENMAN, J.

---

10. The parents could properly be asked for example, whether their son was at home on the night in question; if he was not, the time he left and returned. The answers to such questions would not be protected inasmuch as they do not fall within the ambit of confidential communications or observations. (See *People v Daghita,* 299 NY 194.)