**In re GRAND JURY PROCEEDINGS, UNEMANCIPATED MINOR CHILD.**

**Magistrate No. CY–96–1454A–01.**

United States District Court, E.D. Washington.

Dec. 17, 1996.

---

ORDER DENYING MOTION TO QUASH

WHALEY, District Judge.

Before the Court is a Motion to Quash Subpoena (Ct.Rec. 2 (sealed)), which was filed on behalf of the Unemancipated Minor Child [1] and heard with oral argument and an evidentiary hearing on December 3 and 4, 1996. The motion seeks to quash a subpoena *ad testificandum*, commanding the Unemancipated Minor Child's testimony before the grand jury, on the grounds of a parent-child privilege.

### Background

By means of a subpoena *ad testificandum*, the Unemancipated Minor Child was commanded to testify before the grand jury. The Unemancipated Minor Child understood that he, his mother, and others were targets of the grand jury investigation, as was his father, who had already been charged by means of a criminal complaint. The Unemancipated Minor Child challenged the subpoena on the basis of a parent-child privilege. In support of this challenge, the Unemancipated Minor Child testified that he is seventeen years old, living with his parents. Although he did not provide any details or supporting expert testimony, the Unemanci-

---

1. Throughout this opinion, the Court refers to the movant as the "Unemancipated Minor Child" in order to maintain the confidentiality of sealed documents related to grand jury proceedings.

pated Minor Child testified that he would be psychologically and emotionally damaged if he were compelled to testify against his father. Without providing specifics, the Unemancipated Minor Child also stated that his religious beliefs would be violated by testifying against a parent.

## Analysis

Fed.R.Evid. 501 provides:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

Hence, in the absence of any Supreme Court rules or federal statutes on this subject, the Court looks to the United States Constitution and the principles of the federal common law for guidance as to the nature and parameters of the asserted parent-child privilege.

## Constitutional Underpinnings

 It is well settled that there is a right to privacy associated with family life, whether that be found in the "penumbras and emanations" of the Bill of Rights,[2] in the Ninth Amendment,[3] or in the concept of "liberty" that is derived from the Fourteenth Amendment.[4] This right extends only to "matters so fundamentally affecting a person

as the decision whether to bear or beget a child."[5] Thus, the Supreme Court found that this right of privacy encompasses such private familial activities as marriage,[6] procreation,[7] contraception,[8] and child rearing and education.[9]

Despite clear authority for a realm of privacy protecting families, federal courts have declined to find a constitutional underpinning for a parent-child privilege, with two exceptions discussed *infra.*[10] The leading case on point is *Port v. Heard,* 764 F.2d 423 (5th Cir.1985), which concluded that there is no constitutionally based privilege that prevents parents from testifying against their son. In its opinion, the court considered and rejected arguments that such a privilege derives from the right to privacy, the First Amendment right to exercise one's religion, or the Fourteenth Amendment right to equal protection under the laws (where state statutes created a marital communications privilege). *Id.* at 430–32. *See also In re Grand Jury Proceedings of John Doe v. U.S.,* 842 F.2d 244, 245–48 (10th Cir.1988) (compelling fifteen-year-old Mormon to testify against his mother and other family members did not violate his First Amendment rights given the government's compelling interest in investigating crimes and enforcing the criminal laws of the United States). Further, the opinion of the U.S. Court of Appeals for the Ninth Circuit in *United States v. Penn* can be read to preclude extrapolation of a parent-child privilege from the Due Process Clause. 647 F.2d 876 (9th Cir.) (*en banc,* 5–4) (holding it was

**2.** *Griswold v. Connecticut,* 381 U.S. 479, 484–85, 85 S.Ct. 1678, 1681–82, 14 L.Ed.2d 510 (1965).

**3.** *Id.* at 486, 85 S.Ct. at 1682–83.

**4.** *Roe v. Wade,* 410 U.S. 113, 153, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1973); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042 (1923).

**5.** *Eisenstadt v. Baird,* 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972).

**6.** *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1823–24, 18 L.Ed.2d 1010 (1967).

**7.** *Skinner v. Oklahoma,* 316 U.S. 535, 541–42, 62 S.Ct. 1110, 1113–14, 86 L.Ed. 1655 (1942).

**8.** *Griswold,* 381 U.S. at 484–85, 85 S.Ct. at 1681–82; *Eisenstadt,* 405 U.S. at 453–54, 92 S.Ct. at 1038–39.

**9.** *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); *Pierce v. Society of Sisters,* 268 U.S. 510, 535, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925); *Meyer,* 262 U.S. at 399, 43 S.Ct. at 626–27.

**10.** *In re Grand Jury Proceedings (Agosto),* 553 F.Supp. 1298 (D.Nev.1983) (finding familial privilege and incapacity to testify existed based upon the inherent right to privacy); *In re Grand Jury Proceedings (Greenberg),* 11 Fed.R.Evid.Serv. 579 (D.Conn.1982) (finding First Amendment basis for parent-child privilege of Jewish family).

not a due process violation to permit police to pay a child to point out evidence against his mother), *cert. denied,* 449 U.S. 903, 101 S.Ct. 276, 66 L.Ed.2d 134 (1980). *See also United States v. Davies,* 768 F.2d 893, 897 (5th Cir.) (citing *Penn* and finding there was no constitutional basis to support suppression of phone number received from defendant's daughter by F.B.I. agents), *cert. denied sub nom, Kaprelian v. United States,* 474 U.S. 1008, 106 S.Ct. 533, 88 L.Ed.2d 464 (1985).

Three notable exceptions provide persuasive authority to the contrary but do not ultimately convince this Court that a sufficient constitutional basis exists for recognizing a parent-child privilege that precludes all testimony under the facts of this case. In *In re Grand Jury Proceedings (Agosto),* 553 F.Supp. 1298 (D.Nev.1983) the U.S. District Court for the District of Nevada concluded that the fundamental right to privacy stands as the basis for a testimonial disqualification for family members as well as a parent-child communication privilege. The court stated:

> There can be little doubt that the confidence and privacy inherent in the parent-child relationship must be protected and sedulously fostered by the courts. While the government has an important goal in presenting all relevant evidence before the court in each proceeding, this goal does not outweigh an individual's right of privacy in his communications within the family unit, nor does it outweigh the family's interests in its integrity and inviolability, which spring from the rights of privacy inherent in the family relationship itself. There is no reasonable basis for extending a testimonial privilege for confidential communications to spouses, who enjoy a dissoluble legal contract, while yet denying a parent or child the right to claim such a privilege to protect communications made within an indissoluble family unit, bonded by blood, affection, loyalty and tradition. And further, if the rationale behind the privilege of a witness-spouse to refuse to testify adversely against his or her spouse in a criminal proceeding serves to prevent the invasion of the harmony and privacy of the marriage relationship itself, then affording the same protection to the parent-child relationship is even more compelling.

*Id.,* 553 F.Supp. at 1325. *See also Greenberg,* 11 Fed.R.Evid.Serv. 579 (D.Conn.1982) (finding that the First Amendment formed the basis for a parent-child privilege of a Jewish family).

State courts in New York have also found that the privacy protections guaranteed by the Ninth and Fourteenth Amendments and the inherent right of privacy support the finding of a parent-child privilege in certain instances. *See In re Application of A & M,* 61 A.D.2d 426, 403 N.Y.S.2d 375 (1978). Although the *A & M* court was of the opinion that "the creation of a [parent-child] privilege devolves exclusively on the Legislature," it ultimately concluded that a narrow, fact-bound privilege flowing directly from the federal Constitution precluded parents from being compelled to testify before the grand jury about their sixteen-year-old son. *Id.,* 403 N.Y.S.2d at 381. The court reasoned:

> It would be difficult to think of a situation which more strikingly embodies the intimate and confidential relationship which exists among family members than that in which a troubled young person, perhaps beset with remorse and guilt, turns for counsel and guidance to his mother and father. There is nothing more natural, more consistent with our concept of the parental role, than that a child may rely on his parents for help and advice. Shall it be said to those parents, "Listen to your son at the risk of being compelled to testify about his confidences?"

> It is urged that the court was in error in finding that the Constitution confers a right of family privacy. That position fails to consider a host of cases which have given constitutional dimension to matters concerning the relational interests of parents and children and which acknowledge "a private realm of family life which the state cannot enter."

*Id.* at 378 (citations omitted). In reaching its conclusion, the New York court did not create a blanket privilege. Instead, it determined that the privilege would protect the parents from answering those questions that would invade "the area of family confidentiality," as determined with the possible assis-

tance of an evidentiary hearing "to determine whether the factual context in which the statements were made mandates that the information sought be given constitutional protection." *Id.* at 382. By way of example, the court explained: .

> The parents could properly be asked ... whether their son was at home on the night in question; if he was not, the time he left and returned. The answers to such questions would not be protected inasmuch as they do not fall within the ambit of confidential communications or observations. .

*Id.* at 382 n. 10. *See also People v. Fitzgerald,* 101 Misc.2d 712, 422 N.Y.S.2d 309 (Westchester County Ct.1979) (finding "classic example" of privileged communication where twenty-three-year-old son, while alone with his father, had a 15– to 20–minute conversation discussing a hit-and-run traffic accident).

Currently, the only limits on New York's privilege appear to be those articulated by the New York Court of Appeals in *People v. Johnson,* 84 N.Y.2d 956, 620 N.Y.S.2d 822, 644 N.E.2d 1378, 1379 (1994), when it stated:

> [A] parent-child testimonial privilege (which defendant urges be adopted to preclude his mother's testimony) would not even arguably apply in that defendant was 28 years old at the time of the conversation with his mother; another family member was present; the mother testified before the Grand Jury hearing evidence against defendant; and the conversation concerned a crime committed against a member of the household.

Like others before it, this Court also considered whether there might be a constitutional basis for the marital communications privilege, which would suggest that a parent-child privilege should, by analogy, be recognized under the Constitution. However, case law makes quite clear that the marital communications privilege is the product of the common law, not constitutional jurisprudence. *See, e.g., United States v. Lefkowitz,* 618 F.2d 1313, 1319 (9th Cir.), *cert. denied,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 27 (1980); *LaRoche v. Wainwright,* 599 F.2d 722, 726 (5th Cir.1979); *United States v. Doe,* 478 F.2d 194, 195 (1st Cir.1973).

While agreeing with the principles of *Agosto, Greenberg,* and *A & M,* this Court concludes there is an insufficient basis for deriving a blanket parent-child privilege from the Constitution that would require the quashing of the subpoena in this case. This ruling does not suggest that constitutional protection could never privilege parent-child communications or actions, if presented in light of a more fully developed factual record. Thus, this ruling is without prejudice to subsequent assertions of a parent-child privilege made in response to particular questions and after development of a more complete factual record.

**Common Law**

The Court turns now to the common law. As a preliminary matter, the Court notes that, by contrast to the marital, attorney-client, and doctor-patient privileges, there is a relative lack of authority on the topic of minor children testifying against their parents, despite the likelihood that children, like spouses, probably present some of the most fertile sources of incriminating evidence. The Court believes that the paucity of authority on this topic may reflect a deep-seated sense of respect for the family on the part of state and federal prosecutors. It may also be that the reluctance of prosecutors to subpoena parents and minor children to testify against each other is, in reality, a reflection of the common law in action, whereby prosecutors presume that such testimony would be subject to some sort of parent-child privilege.

Traditionally, there was no parent-child privilege at common law. *See, e.g., John Doe,* 842 F.2d at 246; *United States v. Ismail,* 756 F.2d 1253, 1258 (6th Cir.1985). However, only one federal court of appeals has clearly ruled on the precise issue of whether a minor, unemancipated child can be compelled to testify before a grand jury regarding communications made by a parent with whom the child resides. In *In re Grand Jury Proceedings of John Doe,* 842 F.2d 244 (10th Cir.1988), the Tenth Circuit affirmed a civil contempt order entered when a fifteen-year-old boy refused to testify before the

grand jury against his mother or other members of his family. The *John Doe* court rejected arguments that such testimony was privileged in accordance with his federal constitutional rights of family privacy and free exercise of religion, as well as under the common law and Fed.R.Evid. 501. The court ultimately concluded that no parent-child privilege existed under the facts presented.

Three other circuit courts may have ruled on this issue although the cases do not explicitly reveal the full factual context in which the finding of no privilege was made. In *In re Grand Jury Subpoena of Santarelli*, 740 F.2d 816 (11th Cir.1984) (*per curiam*), for example, the Eleventh Circuit ruled that a son had properly been held in civil contempt because there was no parent-child privilege that would prevent a witness from answering questions before a grand jury about his father. The *Santarelli* court, however, never discussed the age of the child or any other circumstances, such as the nature of the parent-child relationship, the particular communications at issue, or the family's living arrangements. *See also Port*, 764 F.2d at 430–32 (finding no constitutional basis that would preclude testimony of parents regarding their son but not discussing factual circumstances); *In re Matthews*, 714 F.2d 223 (2d Cir.1983) (rejecting arguments in favor of creating an "in-law" privilege); *In re Grand Jury (Starr)*, 647 F.2d 511 (5th Cir.1981) (*per curiam*) (affirming civil contempt order punishing daughter who refused to give testimony against her mother but not revealing the age of the daughter, living situation, or other factual details).

Many more federal courts of appeals have ruled on this question in the context of parent-child relationships that involve emancipated children. Significantly, three appeals courts have dealt with such children but made clear that their holdings might have been different if the facts before them involved minor children. In *United States v. Erato*, 2 F.3d 11, 16 (2d Cir.1993), the Second Circuit ruled that there was no parent-child privilege that would preclude the testimony of the eighty-year-old mother of a fifty-two-year-old being investigated for fraud. The court, nevertheless, stated:

> **[This] case presents a weaker claim for recognition of a parent-child privilege than might be presented in a case involving a minor child.** At least in that situation the argument would be available that compelling a parent to inculpate a minor child risks a strain on the family relationship that might impair the mother's ability to provide parental guidance during the child's formative years.

*Id.* at 16 (emphasis added).

Similarly, in *United States v. Jones*, 683 F.2d 817 (4th Cir.1982), the Fourth Circuit held that there was no familial privilege that could be asserted by a son to avoid giving incriminating testimony in federal court about his father. The court relied, in part, on the fact that the son was "an emancipated adult, not an impressionable very young child," stating:

> Under the circumstances, namely an emancipated, adult child's testimony which only arguably would be adverse to his father, limited to questions unrelated to his familial association with his parent, and involving no communication between father and son, we are satisfied that there simply is no privilege such as Jones has asserted.
>
> Whether, in changed factual circumstances, the presence of other considerations would make a difference, we, of course, have no occasion to consider and do not now address. **In particular, we do not endeavor to decide to what extent the age of the child and whether or not emancipation has occurred may or may not affect the decision as to whether any familial privileges exists.**

*Id.* at 819 (citations omitted and emphasis added).

Likewise, in *Ismail*, 756 F.2d at 1258, the Sixth Circuit concluded that there was no parent-child privilege that would prevent the defendant's son from testifying against his father where the son was thirty years old, lived in a country different from his father, and had already testified during the grand jury's investigation of his father. The court stated:

> [Defendant's son] is an emancipated adult who has not lived in the same country as

his father for many years. **We do not address situations involving, for instance, unemancipated minors who generally require much greater parental guidance and support than do emancipated adults.** We hold only that an emancipated adult, if subpoenaed, must testify against a parent at a criminal trial. The district court correctly refused to recognize the parent-child privilege under the facts of this case.

756 F.2d at 1258.

As revealed by the above-quoted language from the Second, Fourth, and Seventh Circuits, federal courts have been loath to create a blanket rule either recognizing or refuting a parent-child privilege. Instead, the analysis has been conducted on a case-by-case basis, with room left for the development of a narrowly tailored privilege. Because the Court concludes there is no blanket prohibition against a parent-child privilege, it moves on to consider whether common law leaves room for creation of a restricted parent-child privilege.

**Fed.R.Evid. 501**

■ Fed.R.Evid. 501 authorizes the Court to define new privileges by interpreting "common law principles ... in the light of reason and experience." *Jaffee v. Redmond,* — U.S. —, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (federal common law recognizes psychotherapist-patient privilege); *Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980) (foundations and history of the spousal adverse testimony disqualification no longer justify full disqualification of a witness-spouse where one spouse voluntarily agrees to testify against the other).

[T]he Senate Report accompanying the 1975 adoption of the Rules indicates that Rule 501 should be understood as reflecting the view that the recognition of a privilege based on a confidential relationship ... should be determined on a case-by-case basis. The Rule thus did not freeze the law governing the privileges of witnesses in federal trials at a particular point in our history, but rather directed federal courts to continue the evolutionary development of testimonial privileges.

*Jaffee,* — U.S. at — – —, 116 S.Ct. at 1927–28 (citations, internal quotations, and footnote omitted). *See also Trammel,* 445 U.S. at 47, 100 S.Ct. at 911 ("Congress manifested an affirmative intention not to freeze the law on privilege. Its purpose was to provide the courts with the flexibility to develop rules of privilege on a case-by-case basis.") (citation and internal quotation omitted).

■ *Jaffee* provides a framework for determining whether a previously unrecognized privilege should be recognized. This framework begins with the "primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule." *Jaffee,* — U.S. at —, 116 S.Ct. at 1928 (citation and internal quotations omitted). Guided by "reason and experience," the Court may recognize exceptions to this general rule where there is a "public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth," and where the privilege serves public ends. *Id.* at — – —, 116 S.Ct. at 1928–29 (citation and internal quotations omitted).

■ Several additional principles should be borne in mind while conducting this analysis. First, the Court is not bound to consider only judicially created "common-law rulings" as the source of new privileges and may also look to policy determinations made by state legislatures as reflecting both reason and experience. *Id.* at —, 116 S.Ct. at 1929; *Funk v. United States,* 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369 (1933). In the absence of a Congressionally mandated policy on this specific issue, it is the duty of the Court, "if it possess the power, to decide it in accordance with present-day standards of wisdom and justice," rejecting, where necessary, any "outworn and antiquated rule[s] of the past." *Funk,* 290 U.S. at 382, 54 S.Ct. at 215.

■ Second, in recognizing new privileges, the Court should be mindful of the value of creating rules that lead to predictable results.

[I]f the purpose of a privilege is to be served, the participants in the confidential conversation must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.

*Id.* (citations and internal quotations omitted).

■ Third, in developing new privileges, it is not necessary to define with precision the limits of the privilege. In *Jaffee,* the Supreme Court recognized the existence of a psychotherapist-patient privilege but declined to define the privilege with any greater certainty than to say that it applied under the facts of that case. The Court explained:

A rule that authorizes the recognition of new privileges on a case-by-case basis makes it appropriate to define the details of new privileges in a like manner. Because this is the first case in which we have recognized a psychotherapist privilege, it is neither necessary nor feasible to delineate its full contours in a way that would govern all conceivable future questions in this area.

*Id.* at ——, 116 S.Ct. at 1932 (citation and internal quotation omitted).

■ Thus, mindful of the presumption against recognizing new privileges and guided by "reason and experience," the Court must analyze whether a parent-child privilege should be recognized because there is a "public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth," which also serves public ends. *Id.* at —— – ——, 116 S.Ct. at 1928–29 (citation and internal quotations omitted). The Court finds it does.

Both reason and experience mandate the recognition of some form of a parent-child privilege. By way of analogy, the Court notes that confidential communications have been afforded waivable, privileged status in the context of relations between, *inter alia,* attorneys and clients, husbands and wives, priests and penitents, doctors and patients, rape crisis counselors and victims, reporters and sources and, most recently, psychotherapists and their clients.

The privileges between priest and penitent, attorney and client, and physician and patient limit protection to private communications. These privileges are rooted in the imperative need for confidence and trust. The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return. The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out. Similarly, the physician must know all that a patient can articulate in order to identify and to treat disease; barriers to full disclosure would impair diagnosis and treatment.

*Trammel,* 445 U.S. at 51, 100 S.Ct. at 913.

Like these privileges, the parent-child relationship will often be "rooted in the imperative need for confidence and trust." *Trammel,* 445 U.S. at 51, 100 S.Ct. at 913. As with spousal relationships, reason and experience dictate that parents and children share a unique relationship, in which the ability to communicate in confidence without the fear of betrayal will often be the very foundation of the relationship. As with the relationship between spouses, some such relationships will be rich in confidential communications, while others will not. Likewise, as with spousal relationships, the nature and history of the relationship, as well as external circumstances, will likely affect the number and extent of any such communications and should be considered in determining whether the exercise of a parent-child privilege is appropriate in any given case. In this Court's experience—as a judge, parent, child, and spouse—there is no meaningful distinction between the policy reasons behind the marital communications privilege and those behind a parent-child privilege. The same needs that are met by confessing to a priest, divulging fears and wrongdoings to a psychotherapist, or confiding in a spouse are present—and should be encouraged to be

fulfilled—in the context of parent-child relationships. If, for example, a parent were accused of a crime through rumor, indictment, or otherwise, he or she might choose to explain the situation to his or her child. Without such an explanation, the child would be forced to ponder and perhaps defend the parent to others against amorphous and unexplained accusations.

Likewise, children should not be dissuaded from seeking guidance and support from parents during difficult times. Parents should not be discouraged from participating in their children's lives by sharing their joys and providing firm direction when that is needed. As many parents know, supervision of a child takes on many forms. At times it may include honest and forthright discussion. At other times it may take the form of cross-examination to discover, punish, or correct wrongdoing by the child. Especially in light of this society's increasing concern with the weakening of the family structure, such communication and parental guidance should be encouraged, not discouraged, by the judiciary.

As stated, there is little case law directly dealing with whether an unemancipated minor, who lives with his or her parents, can be compelled to testify against them, or *vice versa.*[11] What case law exists does not reveal a groundswell in favor of recognizing a broad privilege. To the contrary, the vast majority of states that have considered this issue have declined to recognize a parent-child privilege, or some variation thereof, on the facts presented to them.[12] Nevertheless, there is growing recognition of the merits of a narrowly tailored privilege that would apply at the very least to prevent minor children from testifying against parents and guardians with whom they reside. Federal district courts in Nevada and Connecticut have applied a parent-child privilege to the facts of the cases before them. Quite notably, three federal circuits—the Second, Fourth, and Seventh—have left open the question of whether such a privilege might exist based upon facts not heretofore presented to them. In addition, at least four states recognize some type of parent-child privilege.[13] In a similar vein, the Criminal Justice Section of the Defense Function Committee of the American Bar Association recently proposed the ABA Model Parent–Child Privileges Statute.[14] Numerous com-

**11.** Although it is not its customary practice, the Court has chosen to request publication of this opinion. It does so because the development of the federal common law—including recognition of new privileges and the honing of time-honored ones—is uniquely dependent on judges writing and publishing opinions that reflect the common law's "reason and experience." As is amply demonstrated by judicial writings on the parent-child privilege, an absence of authority expressly recognizing a privilege tends to be interpreted to mean that none exists. While this tendency makes sense in an area widely discussed by courts, it makes less sense in this context, where, as here, little has been written on the precise issue involved.

**12.** *See, e.g., In re Inquest Proceedings,* —— Vt. ——, 676 A.2d 790, 791 (1996) (no privilege exists that would prevent parents from testifying against their twenty-five-year-old son); *State v. Good,* 308 S.C. 313, 417 S.E.2d 643, 644–45 (1992) (even if juvenile defendant made inculpatory statement to uncle while uncle was serving as guardian ad litem, nothing in either the common law or statute rendered communication made by juvenile to uncle privileged because of uncle's status as guardian ad litem); *State v. Maxon,* 110 Wash.2d 564, 756 P.2d 1297 (1988); *State v. Willoughby,* 532 A.2d 1020, 1021 (Me. 1987) ("We hold that neither the United States

nor the Maine Constitution recognizes a privilege not to testify in court about communications between a child and his parents or between siblings."); *People v. Dixon,* 161 Mich.App. 388, 411 N.W.2d 760 (1987) (concluding that the decision as to whether to adopt a parent-child testimonial privilege is best deferred to legislature); *People v. Sanders,* 99 Ill.2d 262, 75 Ill.Dec. 682, 457 N.E.2d 1241, 1244 (1983) (declining to recognize privilege for communications between parents and children).

**13.** New York is alone in having recognized a constitutionally based parent-child privilege. *See A & M,* 403 N.Y.S.2d at 378–80; *Fitzgerald,* 422 N.Y.S.2d at 309. Idaho and Minnesota have legislatively crafted privileges that apply to minor children and only to communications made by the child to the parent. *See* Idaho Code § 9–203(7); Minn.Stat.Ann. § 595.02(1)(I). Massachusetts also has a legislatively created parent-child privilege that prevents an unemancipated minor child, living with a parent, from having to testify against that parent in any criminal proceeding. Mass.Gen. Laws § 20.

**14.** Under the scheme envisioned by the ABA, there are two privileges: First, the adverse testimonial privilege protects parents and children from testifying when either is a defendant in any

mentators have also written on this issue, often urging that such a privilege be recognized judicially and/or legislatively.[15]

Further, a parent-child privilege is justified by a "public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth," which also serves public ends. *Jaffee*, — U.S. at — - —, 116 S.Ct. at 1928–29 (citation and internal quotation omitted). As recognized by numerous courts, politicians, and the general public, the relationship of parent to child is one that should be fostered and encouraged. *See, e.g., Moore v. City of East Cleveland*, 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977) ("Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this nation's history and tradition."); *Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14 (1977) ("the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promot[ing] a way of life through the instruction of children") (internal quotation omitted); *Yoder*, 406 U.S. at 232, 92 S.Ct. at 1541–42 ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established

beyond debate as an enduring American tradition.").

The Court is not dissuaded from recognizing a parent-child privilege by either of the Ninth Circuit cases that have discussed similar issues. *See, e.g., In re Grand Jury Proceedings (Alba)*, No. 93–17014, 1993 WL 501539 (9th Cir. Dec. 2, 1993) (unpublished); *Penn*, 647 F.2d 876. In *Penn*, an *en banc* panel of the Ninth Circuit, split five to four in reversing a lower court's decision to suppress a jar of heroin taken from the defendant's backyard on the basis that it had been obtained in violation of due process when a police officer received it by paying the defendant's five-year-old son. The Ninth Circuit spoke in broad terms about how "very young children may aid criminal investigations; and sons may inform or testify against mothers," and at the end of its opinion, the court also considered nonconstitutional grounds advanced in support of affirming suppression. 647 F.2d at 880. It stated:

> Federal Rule of Evidence 501 declares that the existence and extent of privileges "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."
>
> There is no judicially or legislatively recognized general "family privilege," and we decline to create one here.

*Id.* at 884–85. Because this case dealt with a motion to suppress evidence rather than testimonial privileges, the above-quoted language is *dicta.*[16]

---

**15.** *See, e.g.*, J. Tyson Covey, *Making Form Follow Function: Considerations in Creating and Applying a Statutory Parent–Child Privilege*, 1990 U.Ill. L.Rev. 879 (1990); Wendy Meredith Watts, *The Parent–Child Privileges: Hardly a New or Revolutionary Concept*, 28 Wm. & Mary L.Rev. 583 (1987); David A. Schlueter, *The Parent–Child Privilege: A Response to Calls for Adoption*, 19 St. Mary's L.J. 35 (1987).

**16.** This point is perhaps made more clearly in *Davies*, where the Seventh Circuit rejected a defendant's argument that evidence (as opposed to testimony) obtained by law enforcement agents from defendant's daughter was inadmissible based on a parent-child privilege. The court stated:

> Privileges apply only to prevent the use of testimony in a judicial proceeding. [The de-

---

type of criminal proceeding, including those before a grand jury. ABA Model Parent Child Privilege Statute (Proposed) § 102. The privilege is inapplicable when "the proceeding concerns an offense against the person or property of the witness or a family member that is purported to have been committed by the witness's parent or child" and when there is joint criminal activity. *Id.*

Second, a jointly held confidential communications privilege may be asserted by a parent or child when either is a party to any proceeding, including those before a grand jury. *Id.* at § 103. Exceptions to the privilege exist where the parent and child are opposing parties, jointly involved in criminal activity, or where the parent or child is a party in any criminal or juvenile proceeding, if the basis of the proceeding is alleged acts committed against the person or property of a family member. *Id.*

Nor is this Court persuaded against recognizing a parent-child privilege by *Alba*, 1993 WL 501539, at *1–2 (concluding that lower court erred in prohibiting the government from compelling a couple to testify about the couple's father/father-in-law, who was being investigated by a grand jury). First, *Alba* is an unpublished decision, which cannot be relied upon as precedent, except when relevant under the doctrines of law of the case, *res judicata*, or collateral estoppel. Ninth Circuit Rule 36–3. Second, the facts of *Alba* are clearly distinguishable from this case. Although the court never stated the ages of the daughter and son-in-law, who were compelled to testify, the fact of their marriage means that they were, at the very least, emancipated, if not over the age of eighteen. If confronted with a different scenario involving, for example, young children testifying against parents with whom they reside, *Alba* does not foreclose the possibility that the Ninth Circuit might rule differently.

 Hence, the Court concludes that reason and experience, as well as the public interest, are best served by the recognition of some form of a parent-child privilege. Despite the Court's recognition of the existence of a parent-child privilege, however, the subpoena in this case is not quashed outright for two reasons (although the Court leaves open the possibility that objections might later be raised and heard on this ground). First, assuming that any judicially recognized privilege in the context of parent-child relations would be similar to the marital communications privilege,[17] or possibly the adverse spousal testimony privilege,[18] the Court concludes that the Unemancipated Minor Child has not made a factual showing sufficient to assert a parent-child privilege. He has merely stated that he is a seventeen-year-old child, living with his parents. He has not demonstrated that all or, in fact, any of the testimony he could provide would necessarily involve communications that were intended to be confidential or that such communications were not made in furtherance of joint criminal activity. As such, he has not made a sufficient showing to satisfy a parent-child privilege modeled on the marital communications privilege. Nor has he made a sufficient showing to satisfy a parent-child privilege if such a privilege were modeled on the adverse spousal testimony privilege; he has not shown how, or to what extent, his testimony would require revelation of actions or communications that would be adverse to his father's interests. Without defining the precise contours of the parent-child privilege—such a task being best left to legislative actors—the Court finds that the mere fact that a parent and seventeen-year-old child reside together is insufficient to make all of their communications and actions privileged.

The second reason for not quashing the subpoena outright is that the parties represented that the Unemancipated Minor Child was a target of the grand jury investigation, as were other people besides his father. Hence, the Unemancipated Minor Child might be questioned on topics not related to his communications with his father or asked

fendant's] daughter gave the F.B.I. agent his telephone number during the F.B.I.'s investigation of the jewel robbery. As the Supreme Court has noted, "[n]either *Hawkins* [*v. United-States*, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958)], nor any other privilege, prevents the Government from enlisting one spouse to give information concerning the other to aid in the other's apprehension." *Trammel*, 445 U.S. at 52 n. 12, 100 S.Ct. at 913 n. 12. [The defendant] makes no assertion that the government ever intended to call his daughter at the trial; his assertions of privilege are based solely on her questioning during the investigation. Thus, neither this phone number nor any other evidence obtained through this criminal investigative lead are subject to suppression by the district court. 768 F.2d at 900.

17. As recognized in the Ninth Circuit, the marital communications privilege bars testimony concerning statements privately communicated between spouses. *United States v. Marashi*, 913 F.2d 724, 729 (9th Cir.1990). It is confined, however, to words or acts intended as confidential communications from one spouse to the other, made during a valid marriage. *Id.* at 729–30 (citations omitted). An exception precludes application of the privilege to communications made in furtherance of joint criminal activity. *Id.* at 730–31 (citations omitted).

18. The adverse spousal testimony privilege, which can be asserted only by the witness-spouse, also allows exclusion of evidence of criminal acts and of communications made in the presence of third persons. *Trammel*, 445 U.S. at 51, 53, 100 S.Ct. at 912–13, 913–14.

to provide adverse testimony regarding his own actions.

**Accordingly, IT IS HEREBY ORDERED:**

The Unemancipated Minor Child's Motion to Quash Subpoena (**Ct.Rec. 2 (sealed)**) is **DENIED.** This denial is, however, **without prejudice** to objections based on a parent-child privilege, which may be made in response to particular questions and in the context of a more fully developed factual record.

**IT IS SO ORDERED.** The Clerk is directed to enter this order and to provide copies to counsel.