UNITED STATES of America,
Plaintiff–Appellee,

v.

Ernest E. MONTGOMERY,
Defendant–Appellant.

No. 92–1435.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 29, 1992.

Decided March 24, 1993.

Donna Eide (argued), Office of the U.S. Atty., Indianapolis, IN, for plaintiff-appellee.

Stuart T. Bench (argued), Douglas C. McMorris, Indianapolis, IN, for defendant-appellant.

Before FLAUM, RIPPLE, and MANION, Circuit Judges.

FLAUM, Circuit Judge.

Ernest Montgomery appeals from his conviction and sentence stemming from a conspiracy to propagate and distribute marijuana in Indiana. We affirm.

## I.

In November of 1988, Ernest Montgomery met with Claude Atkinson at a Denny's restaurant in Indianapolis, to discuss buying some farm property. By the end of the conversation, the two men agreed to start a business of growing and selling marijuana, combining Montgomery's capital with Atkinson's expertise. Tr.Vol. II–81–84. They decided to use Montgomery's cabin in Gosport to grow the seedlings over the winter and to buy land to transplant the seedlings in the late spring. Montgomery set up an elaborate lighting and watering operation at his cabin, conducive to marijuana growth. Tr.Vol. II–94–95. He also enlisted his brother Jerry to join the conspiracy. The coconspirators planted the seedlings in small containers, where they grew for the next three to four months inside the cabin. Tr.Vol. II–109–110. There were sixteen flats holding approximately eleven hundred small containers each. This eventually yielded between twelve thousand and twelve thousand five hundred plants. Montgomery induced Martin David Lee Haynes, the son of his friend Dennis Ray Haynes, to plant-sit, living at the Gosport cabin and tending the seedling plants. Tr. Vol. II–119–121; Vol. III–118–123.

Montgomery leased a farm near Cloverdale in the late spring of 1989. Soon after, Montgomery, Atkinson, Martin Haynes, and Jerry Montgomery planted corn to use as camouflage for the marijuana they planned to grow. In June of 1989, they brought the twelve thousand marijuana plants from the Gosport cabin to the Cloverdale farm and transplanted them between the rows of corn. Tr.Vol. II–122; Vol. III–124–26. Later in the summer, they and Montgomery's girlfriend Lenny Higginbotham removed the male plants, in order to produce a better crop. Alexander Soloweyko and Christian Munz joined the growing conspiracy in order to help with the harvest in late September to early October of 1989. Tr.Vol. II–124. The marijuana was hung in the barn to dry and then bundled for storage. Next, the marijuana was manicured and clipped, or processed, and packaged for sale. Tr.Vol. II–125–27. This labor-intensive procedure took place at the Cloverdale farmhouse, by Atkinson, Haynes, Soloweyko, and Munz, and at the Gosport cabin, by Jerry Montgomery and Lenny Higginbotham. During this period, Montgomery carried a pistol in a shoulder holster. Tr.Vol. II–179–180; Vol. III–143–44.

Meanwhile, Montgomery and Atkinson looked for buyers. Montgomery soon brought in Mark Young, the employer of his wife Cindy Montgomery, who acted as a middleman for buyers from Florida and New York. Tr.Vol. II–140–41, 165–69. Montgomery and Atkinson set the price at twelve hundred dollars a pound, and sold the marijuana in hundred pound lots to Young's buyers on six or seven occasions. Tr.Vol. II–173–74. Montgomery also sold marijuana to other buyers, and some conspirators were paid "in kind." Overall, the conspiracy generated approximately eight to nine hundred pounds of marijuana. Tr. Vol. III–145.

On March 18, 1990, Jerry Montgomery was arrested for drunk driving in Johnson County, Indiana. A search of his car turned up $13,250 in cash and almost 850 grams of marijuana. Tr.Vol. I–55–58; Vol. II–3–13. During a subsequent search of Jerry Montgomery's house, the police found a briefcase containing various documents relating to the conspiracy, including the Cloverdale farm lease, an application and a receipt for a handgun, several other receipts, and four booklets titled "Indoor Marijuana Horticulture," "Marijuana Growers Guide," "How to Grow Marijuana Indoors Under Lights," and "The Primo Plant." Tr.Vol. II–53–57, 63, 68. Ernest Montgomery owned the briefcase and had given it to his brother Jerry for safekeeping. Tr.Vol. II–21–22. The discovery of the briefcase prompted further investigation that broke open the conspiracy to grow and sell marijuana.

On May 1, 1991, the grand jury returned an indictment charging Ernest Montgomery, in counts one, two, and three, with conspiring to manufacture and distribute, intentionally and knowingly manufacturing, and possessing with intent to distribute, in excess of one thousand marijuana plants. He was also charged, in counts four and five, with possessing with intent to distribute in excess of fifty kilograms and in excess of one hundred kilograms of marijuana. Finally, in count six, Montgomery was charged with knowingly carrying or using a firearm during and in relation to a drug trafficking offense. Many of his coconspirators, including Jerry Montgomery and Claude Atkinson, entered into plea agreements and testified against Ernest Montgomery at trial.

## II.

■ Montgomery's first two arguments take issue with the number of plants proven by the government. First, he challenges the sufficiency of the evidence supporting his conspiracy conviction. A defendant making such a challenge bears a heavy burden. *United States v. Maholias*, 985 F.2d 869, 871 (7th Cir.1993). If the evidence, viewed in the light most favorable to the government, establishes that any rational jury could have found the defendant guilty beyond a reasonable doubt, the conviction will be affirmed. *United States v. Curry*, 977 F.2d 1042, 1053 (7th Cir.1992).

Montgomery argues that the evidence presented cannot support the jury's verdict of a conspiracy involving more than one thousand plants. This argument is meritless. The quantity of a controlled substance is not a substantive element of a conspiracy offense. *Maholias*, 985 F.2d at 877 (citing *United States v. Trujillo*, 959 F.2d 1377, 1381 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 277, 121 L.Ed.2d 204 (1992)). Substantial evidence supports the jury's verdict that Montgomery conspired to manufacture and distribute marijuana, and that is sufficient to affirm his conviction. In any event, two coconspirators, Claude Atkinson and Martin Haynes, testified at trial that they, along with Ernest Montgomery, raised and planted approximately twelve thousand marijuana plants between the winter of 1988 and the summer of 1989. Tr.Vol. II–110; Vol. III–124. The jury, properly instructed to view the testimony of witnesses who entered plea agreements with caution (Tr.Vol. IV–212), apparently believed these witnesses. In conducting our review, we defer to the jury's credibility findings. The government presented overwhelming evidence that the conspiracy involved over one thousand plants, the number specified in the indictment and the special verdict form.

Second, he argues that the court erred in calculating his sentence based on twelve thousand plants. We will not revisit the issue considered and resolved in *United States v. Haynes*, 969 F.2d 569 (7th Cir.1992). Like Martin Haynes, Montgomery may be sentenced based on the number of plants as opposed to the actual weight of the marijuana, despite the fact that the marijuana had been harvested, processed, sold, and for all we know, smoked by the time the government discovered the conspiracy. Montgomery entered the conspiracy early and helped cultivate, harvest, and process the marijuana plants. Therefore, like Haynes, he stands convicted of offenses "involving ... marijuana plants," *see* U.S.S.G. § 2D1.1(c) n. *, and basing his sentence on the number of plants, rather than the ultimate weight, is appropriate. *Haynes*, 969 F.2d at 571–72.

Montgomery argues that the evidence does not support the district court's decision to set his offense level at thirty-six, for a minimum of ten thousand plants. We review a sentencing court's factual determinations for clear error. *United States v. Campbell*, 985 F.2d 341, 343 (7th Cir.1993); *United States v. Thompson*, 944 F.2d 1331, 1348 (7th Cir.1991). A sentencing court must make a specific finding of the relevant quantity of drugs, supported by the evidence, before setting the base offense level. *United States v. Edwards*, 945 F.2d 1387 (7th Cir.1991). At Montgomery's sentencing hearing, the district court stated that Montgomery's sentence could be based on the number of plants because of the propagation object of the conspiracy. Sent.Tr. 15. After listening to Montgomery contest the accuracy of the number of plants (Sent.Tr. 11, 19) and to the government describe evidence that supported the twelve thousand plant figure (Sent.Tr. 17–19), the court referred to the equivalency table note which equates one plant with one kilogram if more than fifty plants are involved, unless the actual weight is greater. Sent.Tr. 22–23. The court explained that, because the weight in this case is not greater, the correct determination of the base offense level must stem from the plants. Then the court found that the number of plants involved in this conspiracy resulted in a base offense level of thirty-six.[1] There is no error in this factual determination.

### III.

Montgomery challenges his conviction of count six, arguing that the evidence did not prove that he used or carried his

---

1. The district court apparently found that the approximately nine hundred pound weight would also result in a base offense level of thirty-six, based on the ten thousand kilogram minimum. Because nine hundred pounds is closer to four hundred kilograms, that determi-

nation would have been incorrect. However, the court correctly used a number of plants supported by the evidence to calculate the base offense level. Any error in the pounds-to-kilograms conversion, therefore, is harmless.

gun in relation to the conspiracy. Montgomery's conviction under section 924(c) of Title 18 requires proof beyond a reasonable doubt of two elements: that he used or carried a firearm and that the use or carrying was during and in relation to a drug trafficking offense. *See* 18 U.S.C. § 924(c)(1). We review the evidence in the light most favorable to the government to determine whether any rational jury could have found these elements beyond a reasonable doubt. *United States v. Larkin*, 978 F.2d 964, 971 (7th Cir.1992); *United States v. Ocampo*, 890 F.2d 1363, 1370 (7th Cir.1989).

In this case, there is evidence that Montgomery both used and carried his gun in furtherance of his drug trafficking activities. Atkinson testified that Montgomery carried a gun in a shoulder holster "on a daily basis, or at least every time I saw him" toward the end of the conspiracy. Tr.Vol. II–179. He also testified that Montgomery displayed the gun as "an intimidation factor" before beating up Atkinson in a dispute over the amount Cindy Montgomery should be paid for her part in the conspiracy. Tr.Vol. II–182. Another coconspirator testified that Montgomery carried a gun in a shoulder holster "[a]t least half the time he came to the farm." Tr.Vol. III–143–44.

The testimony of the witnesses clearly establishes that Montgomery "carried" a firearm, according to the plain meaning of that word. "'Using' a weapon under § 924(c)(1) includes the possession of a firearm which in any manner facilitates the execution of a felony." *Ocampo*, 890 F.2d at 1371 (citation omitted). Given the value of the marijuana in this conspiracy and the risky nature of drug trafficking, the jury could have reasonably inferred that Montgomery carried a gun in order to protect his investment and himself. Moreover, it is reasonable to conclude that the firearm imbued Montgomery with additional confidence and a sense of security while he supervised the final stages of the marijuana conspiracy. Therefore, the weapon facilitated the underlying drug trafficking crime. *Id.; see also United States v. Diaz*, 864 F.2d 544 (7th Cir.1988). Finally, the

evidence sufficiently links Montgomery's use of the weapon to the conspiracy, as opposed to merely inadvertent possession "in relation to an obviously unrelated crime." *Ocampo*, 890 F.2d at 1371–72.

## IV.

■ The two remaining issues concern the conduct of the government prosecutors. In assessing claims of prosecutorial misconduct, "'we consider the prosecutor's conduct not in isolation but in the context of the whole trial in order to determine if such conduct was so inflammatory and prejudicial [that] it deprived the defendant of a fair trial.'" *United States v. Weaver*, 882 F.2d 1128, 1141 (7th Cir.1989) (citations omitted). In the context of conduct which does not rise to a constitutional dimension, we may exercise our supervisory power after considering "whether the prosecutor's conduct had a 'substantial influence' on the result of the trial." *Id.*

■ First, Montgomery argues that the trial court's decision not to dismiss the indictment based on prosecutorial misconduct before the grand jury was clear error. The alleged misconduct arose from an exchange between a grand juror and the prosecutor just before the grand jury began to deliberate and vote. The juror asked the prosecutor to "[r]ead ... that list of the people that you are indicting again, slowly." The Assistant United States Attorney replied, "Do you want me to ... I am going to read a list of the people we are indicting again" and then read the names of the alleged conspirators. Montgomery argues that the prosecutor's use of the first person in her answer invaded the province of the grand jury and their independent deliberations and caused him prejudice warranting dismissal of the indictment. The government, conceding that the prosecutor failed to correct the grand juror's misstatement and compounded the problem by adopting the incorrect wording of the question, argues that the isolated and inadvertent response to a clarifying question does not constitute misconduct. Furthermore, the government argues that

the appellant suffered no prejudice from the remark.

The district court denied Montgomery's motion to dismiss the indictment, ruling that the prosecutor's statement did not rise to the level of misconduct. Tr.Vol. IV–55–57. The court accepted the prosecutor's representation that her standard practice includes reminding the grand jury just before their vote that it is their decision whether or not to indict. Tr.Vol. IV–56. In addition, the court decided that one "simple statement at that point in the proceedings before the grand jury" did not compromise the integrity of the process or affect the substantial rights of the defendant. Tr.Vol. IV–57.

We agree. The prosecutor's use of the expression "we're indicting" in response to the request for the list of names was obviously wrong, but not every error amounts to prosecutorial misconduct. There is no reason to believe in this case that the grand jury was influenced by this single mischaracterization.

■ In addition, Montgomery argues that the government's failure to disclose exculpatory evidence constituted a *Brady* violation, and that the court erred in failing to order a new trial. On November 21, 1991, Montgomery filed a motion for a new trial, based on newly received information that certain coconspirators had given statements to the United States Attorney's Office that they had not seen Montgomery carrying a gun. At trial, two coconspirators, Atkinson and Soloweyko, testified that Montgomery carried a gun. Tr.Vol. II–179; Vol. III–143–44. Cindy Montgomery testified that he did not. Tr.Vol. III–216.

The government must disclose exculpatory material evidence to defendants, according to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v.*

*Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).

We review a district court's decision not to order a new trial for an abuse of discretion. On January 3, 1992, the district court denied the motion for a new trial, finding that the "newly discovered evidence" was irrelevant and not exculpatory. The court also held that the government had not violated any *Brady* requirements. After entering guilty pleas, certain coconspirators were interviewed by the United States Attorney's Office. In response to the question of whether they had seen or had knowledge of Montgomery carrying a gun during the conspiracy, Lenny Higginbotham, her brother Denny Higginbotham, and Dennis Ray Haynes answered that they had not. Their statements do not contradict the testimony of Atkinson and Soloweyko, however, because they were not present during the relevant period.

Atkinson testified that Montgomery carried the gun toward the end of the conspiracy, during the harvest and manicuring process. He testified that he, Montgomery, Munz, Soloweyko, and Martin Haynes were present during the harvest, and that Dennis Haynes may have helped on a day when he was not there. Tr.Vol. II–124–25. He further testified that he processed the marijuana at the Cloverdale farmhouse with Martin Haynes, Munz, and Soloweyko. Tr.Vol. II–126. Finally, Atkinson testified that on the day Montgomery removed the gun from the holster and then beat him, only Montgomery and Cindy Montgomery were with him at the Thompson Road house where the sales transactions took place. Tr.Vol. II–180–82. The Higginbothams and Dennis Ray Haynes were not present when Atkinson and Soloweyko saw Montgomery with a gun.

Cindy Montgomery testified that she was not at the farm during the conspiracy. Tr. Vol. III–216. She testified that she was present at the Thompson Road house when the marijuana was there, and that Montgomery did not carry a gun. Although she also was not present when Soloweyko saw the gun, her testimony tends to contradict

Atkinson's testimony about seeing Montgomery with a gun at the Thompson Road house. The jury either found Atkinson more credible, or believed that Montgomery carried the gun at the farmhouse, or both. In any event, there is no reason to believe that additional testimony which does not exculpate Montgomery or contradict the testimony by Atkinson or Soloweyko would have affected the jury's verdict on count six. Therefore, it was not an abuse of discretion for the district court to deny the motion for a new trial.

Montgomery's conviction and sentence are AFFIRMED.