UNITED STATES of America, Plaintiff,

v.

Richard RED ELK, Defendant.

CR 96–30031.

United States District Court,
D. South Dakota,
Central Division.

Feb. 7, 1997.

Diana J. Ryan, Assistant United States Attorney, Office of the United States Attorney, (Karen E. Schreier, United States Attorney), Rapid City, SD, for Plaintiff.

Bruce H. Ellison, Rapid City, SD, for Defendant.

## ORDER ON MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT BEFORE GRAND JURY

JOHN B. JONES, Senior District Judge.

Defendant's Motion to Dismiss for Prosecutorial Misconduct before Grand Jury, Doc. 51, was referred to Magistrate Judge Mark A. Moreno pursuant to 28 U.S.C. § 636(b)(1), and his Report and Recommendation has been filed and served as required by law, and

The defendant having submitted no objections thereto, and the Court has made a *de novo* review of the record herein, including the transcript of the hearing of December 5, 1996 and the exhibits offered at such hearing, and

Upon the record herein,

IT IS ORDERED:

(1) That the Report and Recommendation of the Magistrate Judge, filed herein on January 21, 1997 at Doc. 98, is hereby adopted by this Court in all respects.

(2) That the defendant's Motion to Dismiss for Prosecutorial Misconduct Before Grand Jury, Doc. 51, is denied without prejudice to

the right of the defendant to raise such issue following the jury trial herein.

MORENO, United States Magistrate Judge.

Defendant, Richard Red Elk, has filed a Motion to Dismiss for Prosecutorial Misconduct Before Grand Jury and Memorandum of Law in support thereof, Docket Nos. 51, 52. Plaintiff, United States of America, has filed a written Objection to the Motion, Docket No. 56. The Motion was thereafter forwarded to this Court for handling pursuant to the District Court's[1] earlier Order of Referral. Docket No. 39. Because defendant's Motion is a dispositive one, the Court is only authorized to decide the same on a report and recommendation basis. In accordance with 28 U.S.C. § 636(b)(1), the Court does now make and propose the following Report and Recommendation for disposition of defendant's Motion.

### PROCEDURAL HISTORY

Defendant is charged with the murder of A.B., a twenty-month-old male child, in violation of 18 U.S.C. §§ 1111 and 1153. Docket Nos. 1, 2. The indictment charges that the killing was committed on or about November 2, 1992 in Eagle Butte, South Dakota on the Cheyenne River Reservation, and was done with malice aforethought and by the use of force that caused A.B. to suffer a fatal head injury. *Id.* After being arraigned on the murder charge, defendant filed a Motion to Dismiss based on prosecutorial misconduct that occurred before the grand jury. Docket No. 51. Defendant's Motion was heard, along with various other motions filed by him, at an evidentiary hearing held on December 5, 1996. Docket Nos. 75, 76, 78, 79.

### DISCUSSION

#### I.

Defendant claims in his Motion that the actions and conduct of plaintiff's counsel in conjunction with the grand jury proceedings constituted prosecutorial misconduct. He requests that the indictment be dismissed based on violations of his constitutional

1. The Honorable John B. Jones, Senior United States District Judge, presiding.

rights and/or pursuant to the supervisory powers of the District Court. In support of his request for dismissal, he alleges that prosecutors:

1. Commented on the evidence;

2. Called his ten-year-old son as a witness against him without the benefit of family, counsel or a guardian ad litem, and in violation of the "parent-child/family" privilege;

3. Threatened, intimidated and harassed witnesses related or thought to be sympathetic to him;

4. Impermissibly, repeatedly and falsely told the grand jury that his wife was lying about matters pertaining to A.B.'s death;

5. Misled the grand jury or otherwise engaged in fundamentally unfair tactics before it; and

6. Compromised the independence of the grand jury.

## II.

██ An indictment may be dismissed for prosecutorial misconduct only upon a showing of "flagrant error" that significantly infringes on the ability of the grand jury to exercise independent judgment and actually prejudices the defendant. *United States v. Larrazolo,* 869 F.2d 1354, 1357 (9th Cir. 1988); *Bank of Nova Scotia v. United States,* 487 U.S. 250, 255–60, 108 S.Ct. 2369, 2373–76, 101 L.Ed.2d 228 (1988). Federal courts draw their power to dismiss indictments from two sources, namely constitutional error and their inherent supervisory powers. *United States v. Isgro,* 974 F.2d 1091, 1094–99 (9th

Cir.1992), *cert. denied,* 507 U.S. 985, 113 S.Ct. 1581, 123 L.Ed.2d 148 (1993); *United States v. De Rosa,* 783 F.2d 1401, 1404 (9th Cir.), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3282, 91 L.Ed.2d 571 (1986).

██ "[A] court may dismiss an indictment if it perceives constitutional error that interferes with the grand jury's independence and the integrity of the grand jury proceeding." *Isgro,* 974 F.2d at 1094. To warrant a dismissal on this ground, the prosecutorial misconduct "must significantly infringe upon the grand jury's ability to render an independent judgment." *Larrazolo,* 869 F.2d at 1357 (*citing De Rosa,* 783 F.2d at 1404). The relevant inquiry thus focuses on the impact of the alleged misconduct on the grand jury's impartiality, not on prosecutorial culpability. *United States v. Sears, Roebuck & Co., Inc.,* 719 F.2d 1386, 1392 (9th Cir.1983), *cert. denied,* 465 U.S. 1079, 104 S.Ct. 1441, 79 L.Ed.2d 762 (1984); *De Rosa,* 783 F.2d at 1405. Constitutional error is found "where the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice" to the defendant. *Bank of Nova Scotia,* 487 U.S. at 257, 108 S.Ct. at 2374–75 (*citing Rose v. Clark,* 478 U.S. 570, 577–78, 106 S.Ct. 3101, 3105–06, 92 L.Ed.2d 460 (1986)); [2] *Isgro,* 974 F.2d at 1094. A constitutional violation may also be found if the defendant can show a history of prosecutorial misconduct that is so systematic and pervasive and that it affects the fundamental fairness of the proceeding or if the independence of the grand jury is substantially infringed. *Bank of Nova Sco-*

---

**2.** The Supreme Court has on a number of occasions held that deep-rooted irregularities in grand jury composition could affect the deliberative process and create a structurally defective body such that indictments could be dismissed without a showing of prejudice. *See e.g., Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (racial discrimination in selection of grand jurors compelled dismissal of indictment); *Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979) (same); *Ballard v. United States,* 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946) (exclusion of women from grand jury required dismissal). The Court, however, made clear in *Bank of Nova Scotia,* 487 U.S. at 256–57, 108 S.Ct. at 2374–75, that these "structural defect" cases are not isolated exceptions to an overall rule, but instead are part of a discreet line of cases with a coherent message. Rather than require the defendant to make a difficult if not impossible showing of how subtle, inherent biases and stereotypes from a racially or gender-discriminatory jury can affect the indictment process to his/her detriment, the Court simply created an irrebuttable presumption of prejudice. *Id.* at 257, 108 S.Ct. at 2374–75 ("The nature of the violation allows a presumption that the defendant was prejudiced, and any inquiry into harmless error would have required unguided speculation"); *cf., United States v. Lamantia,* 59 F.3d 705, 708 (7th Cir.1995), *cert. denied,* — U.S. ——, 116 S.Ct. 711, 133 L.Ed.2d 666 (1996).

*tia,* 487 U.S. at 259, 108 S.Ct. at 2375–76; *Isgro,* 974 F.2d at 1094.

A court may also dismiss an indictment under its own supervisory powers "because of misconduct before the grand jury, at least where [the] misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by [the Supreme] Court and by Congress to ensure the integrity of the grand jury's functions.'" *United States v. Williams,* 504 U.S. 36, 46, 112 S.Ct. 1735, 1741–42, 118 L.Ed.2d 352 (1992) (*quoting United States v. Mechanik,* 475 U.S. 66, 74, 106 S.Ct. 938, 943–44, 89 L.Ed.2d 50 (1986) (O'Connor, J. concurring in judgment)). Courts, however, have repeatedly cautioned that such power is limited and must be used sparingly. *See United States v. Santana,* 6 F.3d 1, 10 (1st Cir.1993) (referring to such power as a "potent elixir that should not be casually dispensed"). Indeed, the Supreme Court has semaphored the limitations of such power in several of its recent decisions. *See Williams,* 504 U.S. at 50, 112 S.Ct. at 1743–44 ("any power federal courts may have to fashion, on their own initiative, rules of grand jury procedure is a very limited one, not remotely comparable to the power they maintain over their own proceedings"); *Bank of Nova Scotia,* 487 U.S. at 254, 108 S.Ct. at 2373 (federal court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudice the defendant and may not invoke its supervisory power to circumvent the harmless-error inquiry prescribed by Fed. R.Crim.P. 52(a)); *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (a court may not invoke its supervisory power to reverse a conviction in order to castigate the prosecution for misconduct that did not prejudice the defendant); *United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980) ("the supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court"); *see also, Santana,* 6 F.3d at 9–11. Before dismissing an indictment pursuant to its supervisory power, a court must first find that the defendant was actually prejudiced by the misconduct alleged. Absent such prejudice—that is, absent proof that the "misconduct 'substantially influenced the grand jury's decision to indict'" or proof that "there is 'grave doubt' that the decision to indict was free from the substantial influence of [the misconduct]"—a dismissal is not warranted. *Bank of Nova Scotia,* 487 U.S. at 256, 108 S.Ct. at 2374. Even if the requisite showing of misconduct and prejudice has been made, nonetheless, a court must "tailor[ ] relief appropriate [to] the circumstances." *United States v. Morrison,* 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981). As the court observed in *Bank of Nova Scotia:*

> Errors of the kind alleged in these cases can be remedied by means other than dismissal. For example, a knowing violation of [Fed.R.Crim.P. 6] may be punished as contempt of court. In addition, the court may direct a prosecutor to show cause why he should not be disciplined and request the bar of the Department of Justice to initiate disciplinary proceedings against him. The court may also chastise the prosecutor in a published opinion. Such remedies allow the court to focus on the culpable individual rather than granting a windfall to the unprejudiced defendant.

487 U.S. at 263, 108 S.Ct. at 2378 (citation omitted).

### III.

At the outset, defendant claims that the prosecutors made impermissible comments about the evidence to the grand jury. He first complains about statements made by one of the prosecutors, during the early stages of the grand jury. After telling the jury that A.B. died "... from head injuries of the type being swung into a wall or hit by a bat on these two areas of his head ...", the prosecutor said, "The only explanation that I can come up with is that [defendant] hurt this child at some time ... he's the main suspect...." GrJ.Tr. (6–30–93) at 19, 21.[3]

---

**3.** These statements were made during the course of the prosecutor's examination of defendant's girlfriend at the time, Patricia Red Fox, in an apparent effort to obtain testimony from Red Fox that implicated defendant in A.B.'s death.

He next complains about the prosecutors informing the grand jury that it should not be "surprised" if witnesses related or sympathetic to defendant had "memory" problems and of the eventuality of being presented with the case and asked to return an indictment.[4] Finally, defendant complains about a statement made by the same prosecutor concerning various post-mortem photographs of A.B. that were shown to the grand jury.[5]

The prosecutor often "serves as the 'guiding arm of the grand jury' and is responsible for [the] orderly and intelligible presentation of [the] case". *United States v. Singer,* 660 F.2d 1295, 1303 (8th Cir.1981) (*quoting United States v. International Paper Co.,* 457 F.Supp. 571, 576 (S.D.Tex.1978)), *cert. denied,* 454 U.S. 1156, 102 S.Ct. 1030, 71 L.Ed.2d 314 (1982).

> The purpose of the grand jury requires that it remain free, within constitutional and statutory limits, to operate "independently of either prosecuting attorney or judge." Nevertheless, a modern grand jury would be much less effective without the assistance of the prosecutor's office and the investigative resources it commands. The prosecutor ordinarily brings matters to the attention of the grand jury and gathers the evidence required for the jury's consideration. Although the grand jury itself may decide to investigate a matter or seek certain evidence, it depends largely on the prosecutor's office to secure the evidence or witnesses it requires. The

prosecutor also advises the lay jury on the applicable law.

*United States v. Sells Engineering, Inc.,* 463 U.S. 418, 430, 103 S.Ct. 3133, 3141, 77 L.Ed.2d 743 (1983) (citation and footnote omitted).

■ The prosecutor's initial comments were made in the context of providing general background and investigative information to members of the grand jury, including the crime he (the prosecutor) believed had been committed and who committed it. Although the prosecutor did offer his own explanation for how A.B. was hurt, he told the grand jury that defendant was only a "suspect" and did not express his personal belief as to defendant's guilt. *See Sears,* 719 F.2d at 1388–94. There is certainly nothing iniquitous about the prosecutor advising the grand jury in general terms of the nature of an investigation and who the target of the investigation is. *See United States v. Cederquist,* 641 F.2d 1347, 1353 (9th Cir.1981) (grand jury aware that the prosecutor believes that an indictment is warranted and the fact that the prosecutor conveys such an impression to jurors does not require reversal).

Furthermore, the comments now being attacked were made to the first grand jury empaneled to hear evidence concerning the homicide investigation, not the grand jury that ultimately returned the indictment against defendant. Portions of the testimony heard by the first grand jury were read to the second grand jury. In addition, tran-

---

4. The statements in question are as follows:

> [PROSECUTOR]: Don't be surprised. I'm afraid that our first witnesses will all have terrible memories. But let me explain, that's not all bad. Because when a witness comes in and says, I can't remember, I don't remember a thing, sometimes that's fine, because then they can't later on show up as a defense witness and say, oh, yeah, I remember so-and-so confessed to me about that. Because they are trying to undermine the prosecution's case when it actually gets there.
>
> So I don't necessarily mind if a witness is brought in here and says, I can't remember, I swear I can't remember. Because then their credibility is undermined when they later show up and all of a sudden miraculously remember something that helps the defendant....
>
> But I do want them in here to either find out what they know or what they don't know. Because one way or another, this case is going

to be presented to you eventually for an indictment.

> \* \* \* \* \* \*
>
> [PROSECUTOR]: I think I will bring her back in and just ask her the question what is her recollection of how [A.B.] died. I'm sure she can't remember but we'll bring her in and ask her that question....

GrJ.Tr. (10–18–95) at 16–18.

5. After the testimony of one of the witnesses, some of the grand jurors and the prosecutor engaged in the following colloquy:

> JUROR: The pictures did bother her. I could tell.
> [PROSECUTOR]: That's what they are there for.
> JUROR: Boy, you're ornery.
> JUROR: No, she isn't ornery enough.

GrJ.Tr. (10–18–95) at 42–43.

scripts of all prior testimony were made available to the second grand jury but none of the grand jurors requested any information from the prior proceedings beyond what was read to them. The assailed comments were not read to the grand jury that indicted defendant. It is therefore unlikely that these comments had much, if any, influence on the grand jury's decision to indict defendant. *See United States v. Carr,* 764 F.2d 496, 498–99 (8th Cir.1985) (no prejudice where grand jury before which an FBI agent was improperly characterized as "an agent of the grand jury" did not hand down the indictment against defendant), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 301 (1986).

▪ ■ The prognosticative comments regarding "memory" problems of potential witnesses can be disposed of in short order. These comments were made in the midst of "strategy" discussions between the prosecutor and grand jury members and appear to be an attempt by the prosecutor to explain not only why certain witnesses were being called and had not been asked to testify before but also to give grand jurors an idea of what to expect from the witnesses. Significantly, the prosecutor explicitly stated that the purpose in calling these witnesses was "to [ ] find out what they know or what they don't know" and added that recollection difficulties among witnesses was "not all bad" and that she (the prosecutor) did not necessarily mind if a witness, appearing before the grand jury, said that he/she could not remember. GrJ.Tr. (10–18–95) at 17. This Court sees nothing sinister about the prosecutor's remarks but even if the remarks can be viewed as a comment about the credibility of the witnesses, the same did not constitute misconduct that can support a dismissal of the indictment. *See United States v. Pabian,* 704 F.2d 1533, 1539 (11th Cir.1983).

■ Nor did the prosecutor's statement relating to the eventual presentment of the case for indictment invade the province of the grand jury and its independent deliberations and cause defendant prejudice sufficient to warrant a dismissal. *See United States v. Montgomery,* 990 F.2d 266, 270–71 (7th Cir.1993) (prosecutor's use of the ex-

pression "we're indicting" in response to grand jury's request for a list of names did not rise to the level of misconduct, compromise the integrity of the process or affect the substantial rights of the defendant). Moreover, to the extent that the statement can be construed as an indication from the prosecutor that an indictment was warranted, this impression, if in fact the same was conveyed to the grand jury, does not require dismissal of the indictment. *Larrazolo,* 869 F.2d at 1360–61 (*citing Cederquist,* 641 F.2d at 1353).

■ Similarly, the post-mortem photographs of A.B. (which were shown to the grand jury) and the prosecutor's remarks concerning same, even when viewed in combination, were not sufficiently inflammatory or flagrant to support a claim that absent the introduction of the photographs and the allegedly improper remarks, the indictment would not have been returned. *See United States v. Edmonson,* 962 F.2d 1535, 1539 (10th Cir.1992) (allegedly inflammatory and prejudicial statements and improper photographs held to not constitute misconduct or error of the magnitude required for dismissal). Moreover, defendant does not contend that any of the witnesses altered their testimony or refused to testify because of the photographs. *See United States v. Risken,* 788 F.2d 1361, 1370–71 (8th Cir.) (rejecting defendant's contention that the prosecutor's threat to prosecute a witness for perjury so intimidated a witness that he refused to testify), *cert. denied,* 479 U.S. 923, 107 S.Ct. 329, 93 L.Ed.2d 302 (1986). This, coupled with the lack of any real showing of actual prejudice vitiates any misconduct assertions relating to the photographs. *See United States v. McKie,* 831 F.2d 819, 821 (8th Cir.1987).

**IV.**

Defendant also argues that prosecutors, by calling his ten-year-old son, P.R.E., as a witness before the grand jury, violated the "parent-child/family privilege" and caused the child psychological trauma. In response, plaintiff maintains that the child was a possible witness to the alleged murder and that the interests of justice in calling a potential eyewitness in a murder investigation out-

weigh any constitutional right to family integrity advanced by defendant.

■ As a threshold matter, any claim of prosecutorial misconduct, based on a violation of the "parent-child/family" privilege must fail because there is no such privilege which defendant is entitled to assert under these circumstances. *In re Erato,* 2 F.3d 11, 16 (2d Cir.1993); *In re Grand Jury Proceedings of John Doe v. United States,* 842 F.2d 244, 246–48 (10th Cir.), *cert. denied,* 488 U.S. 894, 109 S.Ct. 233, 102 L.Ed.2d 223 (1988); *United States v. Davies,* 768 F.2d 893, 896–900 (7th Cir.), *cert. denied,* 474 U.S. 1008, 106 S.Ct. 533, 88 L.Ed.2d 464 (1985).

■ Yet even assuming, *arguendo,* that such a privilege does exist, defendant has no standing to assert the privilege because he was not the person subpoenaed to testify before the grand jury. *See Payner,* 447 U.S. at 731–36, 100 S.Ct. at 2443–47; *Trammel v. United States,* 445 U.S. 40, 51–53, 100 S.Ct. 906, 912–14, 63 L.Ed.2d 186 (1980); *see also, United States v. Leisure,* 844 F.2d 1347, 1359 (8th Cir.), *cert. denied,* 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 342 (1988).

Defendant cites *In re Agosto,* 553 F.Supp. 1298 (D.Nev.1983) for the proposition that a parent-child/family privilege arises from the penumbras of the Constitution and that a child cannot be compelled to testify against his father. In *Agosto,* the district court quashed a grand jury subpoena which would have required a child to give testimony for use in a contemplated indictment against the child's father. Because the court quashed the subpoena prior to the child having to testify, the defendant's standing to assert the privilege never became an issue. More importantly, however, *Agosto* has never been

followed by the Eighth Circuit [6] and has been rejected by virtually every other federal court that has been called upon to recognize and apply a parent-child/family privilege. *See In re Erato,* 2 F.3d at 16; *In re John Doe,* 842 F.2d at 246–48; *Davies,* 768 F.2d at 896–900; *Port v. Heard,* 764 F.2d 423, 428–30 (5th Cir.1985); *United States v. Ismail,* 756 F.2d 1253, 1257–58 (6th Cir.1985); *In re Grand Jury Subpoena of Santarelli,* 740 F.2d 816, 817 (11th Cir.1984); *United States v. (Under Seal),* 714 F.2d 347, 349, n. 4 (4th Cir.1983); *In re Matthews,* 714 F.2d 223, 224 (2d Cir.1983); *United States v. Jones,* 683 F.2d 817, 818–19 (4th Cir.1982); *United States v. Penn,* 647 F.2d 876, 885 (9th Cir.) *(en banc), cert. denied,* 449 U.S. 903, 101 S.Ct. 276, 66 L.Ed.2d 134 (1980); *In re Grand Jury Proceedings of Starr,* 647 F.2d 511, 512–13 & n. 4 (5th Cir.1981); *see also, United States v. Duran,* 884 F.Supp. 537, 541 (D.D.C.1995); *United States v. Levasseur,* 699 F.Supp. 995, 1006 (D.Mass.1988), *aff'd,* 867 F.2d 36 (1st Cir.1989); [7] *but see, In re Grand Jury Proceedings, Unemancipated Minor Child,* 949 F.Supp. 1487, 1490–98 (E.D.Wash.1996); *In re Greenberg,* 11 Fed. R.Evid.Serv. 579 (D.Conn.1982). [8] This Court agrees with the "great weight of authority" and finds that there is no compelling basis, legal or otherwise, for acknowledging a parent-child/family privilege under the circumstances present.

[15] In any event, assuming, without conceding, that a parent-child/family privilege does exist and that defendant has standing to assert it, the privilege cannot and should not be applied in this case. In *Trammel,* the Supreme Court granted certiorari to consider whether an accused could invoke the privi-

---

**6.** Nor does it appear likely, in view of its prior precedent, that the Eighth Circuit would follow *Agosto* if asked to. *See In re O'Brien,* 728 F.2d 1172, 1174 (8th Cir.1984) (rejecting witness' argument that compelled testimony before the grand jury would violate his First Amendment right to freedom of association by "compromising his social and family relationships").

**7.** In addition, several states have expressly rejected the parent-child/family privilege. *See e.g., In re Inquest Proceedings,* 676 A.2d 790 (VT.1996); *State v. Good,* 308 S.C. 313, 417 S.E.2d 643 (S.C.App.1992); *State v. Maxon,* 110 Wash.2d

564, 756 P.2d 1297 (1988); *State v. Willoughby,* 532 A.2d 1020 (Me.1987); *People v. Dixon,* 161 Mich.App. 388, 411 N.W.2d 760 (1987); *People v. Sanders,* 99 Ill.2d 262, 457 N.E.2d 1241 (1983); *Three Juveniles v. Commonwealth,* 390 Mass. 357, 455 N.E.2d 1203 (1983), *cert. denied,* 465 U.S. 1068, 104 S.Ct. 1421, 79 L.Ed.2d 746 (1984); *Cissna v. State,* 170 Ind.App. 437, 352 N.E.2d 793 (1976).

**8.** *Greenberg,* like *Agosto,* has not been followed by any federal appellate court. *See Unemancipated Minor Child,* 949 F.Supp. at 1490–98; *In re John Doe,* 842 F.2d at 247.

lege against adverse spousal testimony so as to exclude the voluntary testimony of his wife. 445 U.S. at 41–42, 100 S.Ct. at 907–08. The Court observed that the common law had long recognized a privilege protecting communications between husband and wife, priest and penitent, attorney and client, and physician and patient. 445 U.S. at 44–51, 100 S.Ct. at 912–13. Even so, the Court observed that Congress, in the enactment of Fed.R.Evid. 501, granted federal courts the authority to "continue the evolutionary development of testimonial privileges in federal criminal trials [and federal grand jury proceedings] ... with the flexibility to develop rules of privilege on a case-by-case basis." 445 U.S. at 47, 100 S.Ct. at 910. The Court, however, emphasized the facts that:

> Testimonial exclusionary rules and privileges contravene the fundamental principle that "the public ... has a right to every man's evidence." As such, they must be construed and accepted "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth."

445 U.S. at 50–51, 100 S.Ct. at 912. (Citations omitted). *Trammel* makes clear that the search for truth and society's quest to administer justice creates a strong presumption *against* testimonial privileges because they result in the suppression of competent evidence.

Confidentiality is the essential element of any privilege, and the importance thereof must be weighed against the "need for production of relevant evidence in a criminal proceeding [which] is specific and central to the fair adjudication of a particular criminal case in the administration of justice. Without access to specific facts, a criminal prosecution may be totally frustrated." *United States v. Nixon*, 418 U.S. 683, 713, 94 S.Ct. 3090, 3110, 41 L.Ed.2d 1039 (1974).

After carefully balancing the interests of the respective parties in light of relevant precedent, this Court believes that any par-

ent-child/family privilege available to defendant is outweighed by plaintiff's interests in investigating crimes and enforcing the criminal laws of the United States. *See Branzburg v. Hayes*, 408 U.S. 665, 686–709, 92 S.Ct. 2646, 2658–2670, 33 L.Ed.2d 626 (1972); *In re John Doe*, 842 F.2d at 245–48; *Port*, 764 F.2d at 428–33.

Alternatively, this Court believes that the policy considerations underlying the Eighth Circuit's decision in *United States v. Allery*, 526 F.2d 1362 (8th Cir.1975) apply with equal force here. In *Allery*, defendant was convicted of attempting to rape his twelve-year-old daughter. The Eighth Circuit held that the "anti-marital facts" privilege [9] is subject to an exception for offenses committed against a spouse and/or a child/stepchild. 526 F.2d at 1366–67.

> We recognize that the general policy behind the husband-wife privilege of fostering family peace retains vitality today as it did when it was first created. But, we note that a serious crime against a child is an offense against that family harmony and to society as well.

526 F.2d at 1366. *See also, United States v. White*, 974 F.2d 1135, 1137–38 (9th Cir.1992) (*citing Allery* and holding that the "marital communications" privilege should not apply to a crime committed against a stepchild living in the home).

The fact that A.B. was a foster child as opposed to a child of either defendant or Red Fox is, in this Court's view, a distinction without a difference. Allowing a parent to prevent his own child from giving eyewitness testimony that incriminates the parent in the death of another child residing in the home is not only inconsistent with any recognized privilege but also impedes the search for and the discovery of the truth and the doing of justice. Because the crime allegedly committed against A.B. was also an offense against defendant's entire family and society as a whole, any privileged testimony was admissible.

---

9. This privilege prohibits one spouse from testifying against another during the length of the marriage. The "marital communications" privi-

lege, by contrast, bars testimony concerning statements privately communicated between spouses.

For these reasons, the prosecutor did not abuse the grand jury process by subpoenaing P.R.E. before the grand jury and inquiring about the circumstances surrounding A.B.'s death.

## V.

 Defendant further asserts that various witnesses thought to be sympathetic to him, including P.R.E., were threatened, intimidated and harassed by prosecutors in front of the grand jury. The transcript of P.R.E.'s testimony reveals that he was gently questioned for a brief period of time and was given a break to be with his parents. GrJ. Tr. (2–11–93) at 48–87, 89–92. During his testimony, P.R.E. disclosed that earlier in the day, defendant told him that he (defendant) "might be in trouble". *Id.* at 82–82. Although P.R.E. testified before the grand jury on his own, his parents were in the immediate vicinity of the meeting room and thus able to provide him comfort and support if need be. *Id.* at 92. The prosecutor was kind and patient with P.R.E. and did not intimidate the child. *Id.* at 48–87, 89–92.

Defendant contends that P.R.E. suffered "psychological trauma" as a result of his experience before the grand jury. The transcript, however, does not indicate that he was "traumatized" during his short time with the grand jury. More importantly, whether or not P.R.E.'s grand jury appearance caused him mental harm has little, if any, bearing absent some kind of showing that members of the grand jury were aware of this and influenced by it in their decision-making process. Inasmuch as defendant has failed to establish that P.R.E.'s testimony and alleged injuries influenced the grand jury's decision to indict or unfairly affected its independent judgment, his misconduct assertions must fail. *See Bank of Nova Scotia,* 487 U.S. at 256–62, 108 S.Ct. at 2374–78; *United States v. Pino,* 708 F.2d 523, 529–31 (10th Cir.1983); *see also, McKie,* 831 F.2d at 821.

 In addition to his assertions relating to P.R.E., defendant likewise contends that one of the prosecutors intimidated certain witnesses by advising them of their rights and the consequences of testifying falsely. *See* GrJ.Tr. (10–18–95) at 9–10, 23–24, 55–57; GrJ.Tr. (10–19–95) at 4–6, 64–66. Defendant maintains that the prosecutor, by and through her advisements, "implicitly" threatened these witnesses with criminal prosecution and perjury charges.

 "It is not improper *per se* for a . . . prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely. But warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify." *Risken,* 788 F.2d at 1370 (*quoting United States v. Blackwell,* 694 F.2d 1325, 1334 (D.C.Cir.1982)).

The prosecutor's statements in the instant case do not approximate the kind of governmental misconduct held unconstitutional in *Webb v. Texas,* 409 U.S. 95, 98, 93 S.Ct. 351, 353–54, 34 L.Ed.2d 330 (1972) (*per curiam*) in which the trial court gratuitously and at great length admonished the defendant's only witness not to lie and warned him of the dire consequences of perjury, or in *United States v. Smith,* 478 F.2d 976, 979 (D.C.Cir. 1973), in which the prosecutor threatened to prosecute the prospective witness for past crimes if he took the stand and testified in a pending trial. Rather, this Court is convinced that the prosecutor's statements amounted to a constitutionally permissible "warning" of the dangers of committing perjury. *Risken,* 788 F.2d at 1371; *see also, United States v. Holloway,* 778 F.2d 653, 657 (11th Cir.1985) (prosecutor may inform witness that he would be subject to prosecution for lying to grand jury), *cert. denied,* 476 U.S. 1158, 106 S.Ct. 2276, 2277, 90 L.Ed.2d 719 (1986). All of the witnesses were able to testify and did so even after the perjury explanation was given to them. No witness was threatened with retaliatory prosecution if he/she refused to testify. The prosecutor's remarks were limited to warning the witnesses about the serious consequences of testifying falsely and answering any questions they had about what perjury was. *See e.g.,* GrJ.Tr. (10–19–95) at 4–6. The advisements given appear to be substantively the same or at least similar to the ones upheld in *Risken,* 788 F.2d at 1370–71.

While prosecutors should exercise considerable restraint when advising witnesses of the potential dangers of committing perjury, the prosecutor here stayed well within acceptable limits in her dealings with witnesses believed to be "on defendant's side". *Risken,* 788 F.2d at 1370–71; *Blackwell,* 694 F.2d at 1334–36; *see also, Holloway,* 778 F.2d at 655–59.

## VI.

■ Defendant next contends that prosecutors falsely accused "wife", Red Fox,[10] of lying to the grand jury. *Id.* at 59. The "accusatory" statements defendant refers to were made during the prosecutors' examination of Red Fox.[11] It is apparent from the grand jury transcript that Red Fox was uncooperative at times and conveniently could not recall certain important events. Just as any other attorney would do when examining a hostile witness, prosecutors challenged Red Fox and her memory lapses, not in an effort to "insinuate" to the grand jury that she was lying, but rather in an attempt to flush out the truth and find out what really happened on the night of A.B.'s death. Prosecutors aggressively tried to solicit candid responses from Red Fox about her knowledge of what transpired on the night in question but did not do so in such a flagrant or abusive manner that would dictate judicial intervention and corrective action. *Sears,* 719 F.2d at 1393–94; *Pabian,* 704 F.2d at 1539–40; *see also, United States v. Rodriguez,* 777 F.Supp. 297, 298 (S.D.N.Y.1991) (prosecutor's question to grand jury witness concerning whether he knew what a "cock and bull story" was was better left unasked but not too prejudi-

cial as to warrant dismissal of the indictment); *United States v. Ruiz,* 702 F.Supp. 1066, 1072–73 (S.D.N.Y.1989) (statements to first grand jury implying the prosecutor's disbelief of defendant's testimony did not constitute prosecutorial misconduct mandating dismissal of the indictment), *aff'd,* 894 F.2d 501 (2d Cir.1990).

The fact that the grand jury had been earlier furnished with Red Fox's testimony and was thus aware of what she saw, did and knew of that fateful day, not only reinforces this conclusion but also rebuts any claim on the part of defendant and of actual prejudice. *Id.; see also, Bank of Nova Scotia,* 487 U.S. at 254–63, 108 S.Ct. at 2373–78. So too does Red Fox's handwritten log for the time period of September 23, 1992 through November 2, 1992 which the grand jury obtained from her in conjunction with her later testimony. *See* GrJ.Tr. (10–19–95) at 75–86 & Ex. 3.

Defendant bases his misconduct contention on *United States v. Samango,* 607 F.2d 877 (9th Cir.1979). In *Samango,* the prosecutor gave the grand jury lengthy transcripts of testimony given before previous grand juries and did not warn it of a key witness' doubtful credibility. 607 F.2d at 881–83. The Ninth Circuit found that the transcript of the defendant's testimony was "an impressive repertory of insults and insinuations" and "contained much testimony by the prosecutor in the form of questions which were usually denied and definitely conveyed the prosecutor's belief that [the defendant] was guilty and evasive." 607 F.2d at 883. The appeals court held that the "cumulative effect" of the prosecutor's conduct "operated to the defen-

---

**10.** Although defendant and Red Fox had five children together, resided under the same roof and may have been considered husband and wife in the "Indian way", they did not marry until April, 1996, the same month defendant was indicted on the murder charge.

**11.** Defendant points to two instances where this occurred. First, after Red Fox testified that she could not really remember why she took A.B. to the hospital the night of November 2, 1992, one of the prosecutors retorted:

I don't think there's anyone in this room that believes that you can't remember what you saw that made you think you should take him to the hospital. So tell the grand jury the truth

about what you saw that made you think you should take him to the hospital.... GrJ.Tr. (10–19–95) at 35. Later, when Red Fox could not remember how defendant disciplined A.B., the other prosecutor pressed harder:

But it's fairly significant, in my opinion, that all of those children had expressed recollection of how [defendant] disciplined [A.B.]. I find it hard to believe that if the children noticed how [defendant] disciplined him that you would fail to notice. So I'm going to ask you again to think a little bit harder and talk about how [defendant] would discipline [A.B.]. *Id.* at 59.

dants' prejudice by producing a biased grand jury" and affirmed the district court's dismissal of the indictment. 607 F.2d at 884–85.

The facts here are a far cry from those in *Samango.* In short, *Samango* is factually distinguishable and therefore inapposite.

## VII.

■ Ever persistent, defendant argues that prosecutors misled the grand jury and failed to correct the false impression they created concerning his guilt. According to defendant, prosecutors elicited testimony that showed he and Red Fox borrowed money and attempted to hire an attorney shortly after the November 2, 1992 incident (thereby intimating that he must be A.B.'s killer) but offered no evidence to dispel this impression or explain his actions or motivations for doing so.

■ The grand jury, however, need only hear the prosecution's side of an investigation and need not be presented with exculpatory evidence in the possession of the prosecutor. *Williams,* 504 U.S. at 51–52, 112 S.Ct. at 1744–45. A suspect or defendant has no right to have evidence favorable to him or her presented to a grand jury, just as he/she has no right to testify him/herself before such a body. *Id.* at 51, 112 S.Ct. at 1744; *see also, Isgro,* 974 F.2d at 1096 ("in fairly expansive language, *Williams* clearly rejects the idea that there exists a right to such 'fair' or 'objective' grand jury deliberations").

■ Nonetheless, a prosecutor may not deliberately mislead a grand jury or instill false impressions to it in an effort to obtain an indictment. *See De Rosa,* 783 F.2d at 1404–07. Yet, "absent some evidence of gross purposeful deception by the prosecutor, an indictment legally valid on its face will not be overturned because it is possible that some of the evidence presented to the grand jury may have permitted an erroneous ad-

verse inference...." *United States v. Levine,* 700 F.2d 1176, 1179 (8th Cir.1983) (*quoting United States v. Cady,* 567 F.2d 771, 776 (8th Cir.1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978)). Defendant does not claim that the indictment is invalid on its face. Nor has he met his burden and overcome the strong presumption of regularity afforded to grand jury proceedings or shown that the grand jury was, in fact, misled or deceived by the intentional conduct of the prosecutors or that he suffered actual prejudice therefrom. *McKie,* 831 F.2d at 821; *Kouba,* 822 F.2d at 773–74; *United States v. Hintzman,* 806 F.2d 840, 843 (8th Cir.1986); *Levine,* 700 F.2d at 1178–80; *United States v. Johnson,* 767 F.2d 1259, 1275 (8th Cir.1985); *see also, De Rosa,* 783 F.2d at 1404–07; *Pino,* 708 F.2d at 529–31.

## VIII.

■ Finally, defendant claims that the independence of the grand jury was compromised and that dismissal of the indictment is mandated. This Court has carefully scrutinized the record and, in particular, the grand jury transcripts and believes that the cumulative effect of the assignment of errors and indiscretions did not operate to defendant's prejudice by producing a biased grand jury. In other words, the prosecutorial misconduct alleged was not a substantial encroachment on the grand jury's ability to exercise its independent judgment. *Edmonson,* 962 F.2d at 1539; *Larrazolo,* 869 F.2d at 1357–61; *De Rosa,* 783 F.2d at 1404–07; *Sears,* 719 F.2d at 1391–94; *Pino,* 708 F.2d at 529–31; *see also, Bank of Nova Scotia,* 487 U.S. at 254–63, 108 S.Ct. at 2373–78; *Isgro,* 974 F.2d at 1095–99.

## IX.

■ In summation, this Court finds that the misconduct asserted was not sufficiently egregious to abrogate defendant's constitutional rights[12] and support a dismissal of the

---

12. Although some courts have analyzed the constitutional component of prosecutorial misconduct claims under the Due Process Clause of the Fifth and Fourteenth Amendments, *see Samango,* 607 F.2d at 881 and *United States v. Basurto,* 497 F.2d 781, 785 (9th Cir.1974), in light of applica-

ble precedent and the Constitution itself, it appears that the right to unbiased treatment by a grand jury is really one grounded in the Grand Jury Clause of the Fifth Amendment. Because the grand jury's determination is a preliminary one, and because the entire panoply of constitu-

indictment. The Court likewise finds that even when added together, the instances of alleged misconduct do not raise a substantial question, much less a grave doubt, as to whether they had a substantial effect on the grand jury's decision to indict defendant on the murder charge. Inasmuch as defendant has failed to show the existence of either constitutional or prejudicial errors that warrant dismissal of the indictment, his Motion must be denied.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing and in accordance with 28 U.S.C. § 636(b)(1), this Court concludes that prosecutors did not circumvent the grand jury's autonomy by using flagrant or overreaching conduct that requires the indictment be dismissed because of constitutional errors or pursuant to a court's supervisory powers. Accordingly, the Court recommends that defendant's Motion to Dismiss For Prosecutorial Misconduct Before Grand Jury, Docket No. 51, be denied.

DATED Pierre, South Dakota
 Jan. 21, 1997.

## NOTICE

Failure to file objections to the within Report and Recommendation for Disposition within ten days from the date of service shall bar an aggrieved party from attacking the Report before the assigned United States District Judge. *See* 28 U.S.C. §§ 636(b)(1).

tional protections are available to the defendant at trial, courts have not been inclined to extend due process rights to grand jury proceedings. *See e.g., United States v. Calandra,* 414 U.S. 338, 349, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974) ("Because the grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigative and accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial"); *Silverthorne v. United States,* 400 F.2d 627, 639 (9th Cir.1968), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971) ("If a grand jury is prejudiced by outside sources when in fact there is sufficient evidence to indict, the greatest safeguard to the liberty of the accused is the petit jury and the rules governing its determination of a defendant's guilt or innocence"). Thus, as already alluded to herein, the constitutional grounds for dismissal of an indictment are limited. Indeed, "[a]n accused's only cognizable interest in grand jury proceedings, therefore—the only interest that courts can vindicate by dismissing indictments on constitutional grounds—is to have a legally constituted grand jury make and form an independent evaluation of the evidence to determine if there is probable cause to believe [him/her] guilty of a crime." *Sears,* 719 F.2d at 1391, n. 7 (*citing Cederquist,* 641 F.2d at 1352).